**DIAL MEDIA, INC.**

v.

**Arthur SCHIFF.**

**C.A. No. 84–0195B.**

United States District Court,
D. Rhode Island.

June 27, 1985.

David A. Schechter, Providence, R.I., for plaintiff.

Richard P. McMahon, William F. McMahon, McMahon & McMahon, Providence, R.I., for defendant.

## OPINION

### FRANCIS J. BOYLE, Chief Judge.

The Plaintiff brought this action to enforce a restrictive covenant in an employment contract, requesting injunctive relief and damages. Defendant counterclaimed seeking, in the alternative, an injunction against the enforcement of the restrictive covenant or a declaratory judgment that the covenant is unenforceable. Defendant also seeks damages for wrongful termination of his employment in violation of the terms of the written agreement.

Defendant filed a motion for preliminary injunction which was denied by this Court for lack of showing of irreparable harm.

### FACTS

Defendant, Arthur D. Schiff, received a degree in broadcasting in 1961 and has been employed since then in the capacity of Assistant Creative Director with Beau Bernstein, and as Creative Director with Berrison and Isham.[1] He has also performed direct response advertising work for the Morton Company. Beginning in 1976, he did freelance work, including twenty-nine jobs for the Plaintiff, Dial Media, Inc., of which seventeen were direct response television ads.

Plaintiff, Dial Media, Inc. is a corporation which engages in the advertising business. Ninety (90) percent of the dollar volume of Dial Media is involved in the purchase of advertising time on television, principally involving two minute spots which commence with an attention getting introduction and proceed to seek to sell a product to the television viewer. The viewer can then order the product either by telephone call or by mail, and the product will be delivered by mail. Dial Media traces its success in the direct response mailorder advertising industry to its methods which require that a product (1) have universal appeal, (2) be highly demonstrable, and (3) be priced right. In addition, this type of advertising requires a frequency and a rotation on certain programs.

Dial Media hired Mr. Schiff in January, 1978 as a Creative Director, and a few days later an employment contract was discussed. Mr. Schiff objected to, among other items, a five hundred mile area of limitation of competitive employment after the termination of the employment contract and no contract was executed at that time. On October 17, 1979, twenty-one months after Mr. Schiff's hiring date, Mr. Schiff and Dial Media entered into a one year employment agreement continuing from year to year thereafter which, in paragraph seven, contained a restrictive covenant limiting Mr. Schiff's employment for a period of five years after termination of his employment with Dial Media. Paragraph seven also related to an agreement not to disclose information or knowledge acquired during his employment relative to the management, operation, marketing, sales, distribution of product, advertising and creative methods of the employer or the employer's clients. Paragraph seven provides:

> For a period of five (5) years after the termination of this Agreement, the Employee will not, within the radius of five hundred (500) miles from the present place of business of the Employer, direct-

business.

---

1. A creative director is one who creates commercial materials for use in the advertising

ly or indirectly, own, manage or operate, control, or be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control of any business that deals in direct response mailorder advertising. Further, during the term of this Agreement and for a period of five (5) years thereafter, the Employee shall not disclose any information or knowledge to any third party, either directly or indirectly, which said Employee has acquired during his employment with the Employer relative to the management, operation, marketing, sales, distribution of product, advertising and creative methods of products of the Employer and its clients. The Employee agrees that the remedy at law for any breach of the provisions of this paragraph will be inadequate, and that the Employer, its successors and assigns, shall be entitled to temporary and permanent injunctive relief, including reasonable attorneys' fees, as well as any other relief or damages to which it may be entitled at law, in equity or otherwise; and that, if any suit or other litigation is brought against the Employee alleging breach of the restrictions contained in this paragraph, then in such event, the Employee will not in such affirmatively raise or assert as a defense that said restrictions are invalid, illegal or otherwise unenforceable. The parties further agree that if, notwithstanding the foregoing, any court of competent jurisdiction shall at any time in the future find that said restrictive covenant is overlong in time, or over-broad in scope, or otherwise impermissible, then in such event, such court shall have full and plenary right and authority to modify the terms of such covenant so as to limit parameters thereof, or both, so as better to perfect and carry out the intentions of the parties as expressed herein.

With respect to termination of employment, the agreement provided in paragraph six:

*"Termination.* The Employer may terminate this Agreement if after written notice to the Employee, the Employee continuously fails to perform the responsibilities and the duties assigned to said Employee by the Employer."

On January 17, 1983, Mr. Schiff submitted a letter of resignation under the provisions of the agreement effective October 16, 1983. On January 19, 1983, Mr. Crocker, Mr. Schiff's direct supervisor, wrote a letter to Mr. Schiff terminating his employment as of that date.

Plaintiff's witnesses and Defendant gave different accounts of circumstances preceding Mr. Schiff's termination. According to Plaintiff's witnesses, Mr. Schiff always had difficulty with his memory, his attitude, bad hygiene, and interpersonal relationships with employees, and these problems were repeatedly brought to his attention. Plaintiff contends that Mr. Schiff's performance deteriorated during the last six to eight months before he left Dial Media, culminating in disorderly behavior at the 1982 company Christmas party. During this time Mr. Schiff failed to show up for television commercials, said he was ill and needed to get away for awhile to think, and took a few days off to live in a tent in Florida.

Mr. Schiff's version of events leading to his termination depicted increasingly unreasonable pressures exerted by Dial Media on a conscientious employee, who continued, in the main, to live up to his responsibilities and duties. Mr. Schiff pointed out that his wages increased from $384 to $775 per week as of May 30, 1982, and that he was promoted to the position of vice-president of Dial Media in May, 1982.

Mr. Schiff contended that his termination by Dial Media resulted because Mr. Valenti, president of the corporation, was hurt that Mr. Schiff resigned without prior consultation which might have resolved the matter.

Following his termination the Defendant formed a company, Direct Response Associates, Inc., which is incorporated in Florida. This company competes for the same television time that Dial Media competes for, and has clients in the northeast states, among them Urban General, one of Plaintiff's largest competitors.

The principal issues in this case are: (1) has the Defendant violated a valid agreement which is limited to participation in any business that deals in "direct response mailorder advertising"; (2) is the form of the covenant unreasonable under Rhode Island case law; and (3) was Defendant's termination a violation of paragraph six of the agreement.

## I. TERMS OF THE AGREEMENT

Jurisdictions have split on the question whether continuation of the employment relationship constitutes sufficient consideration for a restrictive covenant in a contract signed subsequent to employment. *See, e.g., George W. Kistler, Inc. v. O'Brien,* 464 Pa. 475, 485, 347 A.2d 311, 316 (1975) (continued employment alone insufficient as consideration for restrictive covenant). Because there is no Rhode Island case on point, and because this case can be decided on other issues, this Court does not reach the issue whether continued employment itself could constitute sufficient consideration for the October 17, 1979 agreement. This Court does find as a fact that continued employment was the only consideration present, despite Plaintiff's contention that Mr. Schiff was granted increased responsibilities in exchange for signing the agreement. Mr. Schiff received no promotion as of October 17, 1979, and no increase in pay. Mr. Schiff had received regular pay increases prior to signing the restrictive covenant, and he continued to receive increases subsequent to October 17, 1979; however, there was no change in duties, responsibilities, or benefits, as of that date, which could be attributed to his signing of the agreement. Testimony for Plaintiff was that only after signing the restrictive covenant was Defendant permitted to become involved with product selection. Defendant contends that from his first week of work for Dial Media, he was involved in product selection, and that even before hiring him, Dial Media gave him a test run to evaluate his instincts regarding product selection. This Court resolves this conflict in favor of Defendant and finds that involvement in product selection did not constitute new consideration for the October 17, 1979 agreement.

Assuming that continued employment alone provided valid consideration for the restrictive covenant, has the Defendant violated the terms of that agreement? Deciding whether a violation has occurred requires construction of the language in paragraph seven which prohibited Mr. Schiff from owning, operating, being employed by, participating in, or being connected with the operation of any business which deals in "direct response mailorder advertising".

The question of what constitutes "direct response mailorder advertising" within the context of the employment contract is a hotly contested issue. Defendant contends that only advertising which reaches potential customers through the mails and which requires a response by mail falls within the definition of "direct response mailorder advertising." In other words, Defendant argues that television direct response advertising is excluded from the terms of the agreement.

Plaintiff, on the other hand, while admitting that the phrase was inartfully drafted, takes the position that some meaningful sense must be made of the phrase, and argues that the understanding of the parties at the time of execution should determine the meaning of the phrase. Testimony shows that 90% of Plaintiff's business is made up of television direct response advertising, and Plaintiff points out that Mr. Schiff was aware that it was that area of advertising which Dial Media sought to protect. Plaintiff would construe the words "direct response" as descriptive of the method by which products are advertised (*i.e.* television media directly in the home, with no middleman retailer). Plaintiff would construe "mailorder" as describing the method by which the product is delivered to the customer. When ambiguity as to terms of a contract exists, the Court should consider the situation and all accompanying circumstances to determine the meaning of the terms. *See Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 256 A.2d 10 (1969); *Massasoit Housing Corp. v. N. Kingstown,* 75 R.I. 211, 65 A.2d 38 (1949).

If the words of a contract taken literally defeat the intention, the Court should interpret them consistent with the general intent of the parties, as gathered from their relative positions and surrounding circumstances. *Massasoit, supra* at 216, 65 A.2d at 40; *Pawtucket Machinery and Supply Corp. v. Monroe,* 73 R.I. 162, 164, 54 A.2d 399, 400 (1947). An interpretation which gives reasonable and effective meaning to all manifestations of intent is to be preferred to one which leaves part of the manifestation of no effect. *Hill, supra* 106 R.I. at 47, 256 A.2d at 14. To interpret "direct response mailorder" as Defendant urges, would assign the phrase no practical applicability, since Plaintiff's business is only peripherally concerned with non-television advertising, and Plaintiff could therefore have no motive for protecting that area of advertising. Defendant by his own admission was aware of the nature of Plaintiff's business, and it is unlikely that he would misunderstand Plaintiff's purpose in including paragraph seven in the employment agreement. In fact, Defendant's testimony that he refrained from engaging in direct response television advertising in the New England area for several months, due to Plaintiff's warning that paragraph seven would be enforced, indicates that Defendant and Plaintiff mutually understood the phrase to mean the type of business in which Dial Media was engaged, namely television direct response advertising. Since the parties' intention governs in construing contract terms this Court accepts Plaintiff's definition of "direct response mailorder advertising" and finds that Defendant violated the terms of paragraph seven.[2]

There is no evidence that Defendant is using talents and techniques acquired by reason of his employment by Plaintiff after the agreement was executed on October 17, 1979, twenty-one months after he began his employment with Plaintiff. It is not suggested that the October 17, 1979 agreement is retroactive in the sense that it precludes Defendant from using talents and techniques acquired before that date either from his prior employment by others, his "freelancing" activities on behalf of Plaintiff, or his employment by Plaintiff for twenty-one months before the employment agreement was executed, or that such a result was even contemplated by the parties. Clearly, such an intent is not stated in the employment agreement itself.

## II. REASONABLENESS

█ Non-competitive covenants are not favored by the courts, and are carefully scrutinized. *Koppers Products Co. v. Readio,* 60 R.I. 207, 215, 197 A. 441, 444–445 (1938). Since equitable jurisdiction is being invoked, these covenants are subject to a reasonableness standard. *Id.* Rhode Island law is generally adoptive of the provisions contained in § 515 of the Restatement of Contracts (First) in determining whether the terms of a covenant are reasonable. *See Mento v. Lanni,* 106 R.I. 683, 687–688, 262 A.2d 839, 841 (1970); *Max Garelick, Inc. v. Leonardo,* 105 R.I. 142, 148, 250 A.2d 354, 357 (1969). Section 515 states that a covenant in restraint of trade is unreasonable if it "(a) is greater than is required for the protection of the person for whose benefit the restraint is imposed, or (b) imposes undue hardship upon the person restrained." Restatement of Contracts § 515(a) and (b) (1932).

Since the adoption of § 515(a) and (b) in *Mento v. Lanni, supra* and *Max Garelick, Inc. v. Leonardo, supra* the Restatement (Second) of Contracts has been published. The issues addressed in § 515(a) and (b) of the First Restatement appear in § 188(1)(a) and (b) of the Second Restatement. Section 188(1)(a) and (b) states that a promise to refrain from competition which imposes an ancillary restraint is unreasonably in restraint of trade if, "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Restatement (Second) of Con-

---

**2.** The Court finds Defendant's argument that his business is not "operated" or "situated" in New England of no value since Defendant admits soliciting customers and using production facilities in the area.

tracts § 188(1)(a) and (b) (1979). Sections 188(1)(a) and (b) of the Second Restatement are substantially §§ 515(a) and (b) rewritten, which have been adopted by the Rhode Island Supreme Court.

In deciding what level of restriction is warranted to protect Dial Media's legitimate interests, the issue of exactly what constitutes those interests must first be resolved.

Courts have upheld protection of good will which was acquired in a transaction involving the sale of a business, where competition by the seller would deprive the buyer of part of the consideration paid. *See, e.g. Koppers, supra.* Courts have also enforced restrictive covenants when the plaintiff had trained the defendant in unique or novel services in exchange for which the defendant agreed not to use those unique skills to compete against the original employer. *See, e.g., Max Garelick, supra,* at 148, 250 A.2d at 357 (citing *Welcome Wagon, Inc. v. Haschert,* 125 Ind. App. 503, 506, 127 N.E.2d 103, 105 (1955)). The absence of special, peculiar services performed by a defendant has also been used by a court to defeat enforcement of a restrictive covenant. *See, e.g., Timenterial, Inc. v. Dagata,* 29 Conn.Supp. 180, 277 A.2d 512 (1971) (covenant involved non-competition in the sale and rental of mobile homes). Frequently, cases which upheld enforcement of restrictive covenants against former employees involved the employee's misuse of trade secrets to give the employee an unfair competitive advantage over the former employer. *See, e.g., American Eutectic Welding v. Rodriguez,* 480 F.2d 223 (1st Cir.1973) (employee used confidential price lists and special relationship established with former customers to deliberately undercut his former employer). Even where trade secrets were involved, however, the court narrowly tailored the enforcement of the covenant to a precise protection of a specifically defined interest of the former employer, such as confidential information. *Id.* at 228–29. (court limited protection only to abuse of privileged information acquired while personally servicing specific customers, and even then only as to specific products).

■ In distinguishing between those interests which were protectable and those undeserving of protection, Rhode Island courts have been governed by "considerations of extensiveness or localism, of protection of interests sold and paid for, of mere deprivation of public rights for private gain, of proper advantage on one side or useless oppression on the other." *Mento, supra* 106 R.I. at 687, 262 A.2d at 841 (citing *Oakdale Manufacturing Co. v. Garst,* 18 R.I. 484, 489–90, 28 A. 973, 974–75 (1899)). In the present case, the Plaintiff has not asserted that Mr. Schiff used trade secrets to acquire an unfair advantage to Dial Media's detriment, nor has Plaintiff demonstrated any unique or novel training of Mr. Schiff.[3] Thus, the only interest which Plaintiff could assert is the desire to be free of competition from its former employee, who had engaged in the activity which Plaintiff seeks to prohibit before coming to work for Dial Media. This interest is not a protectable one since in the absence of trade secret abuse, misappropriation of good will, or other damage Plaintiff is simply attempting to restrain competition which is in this instance an unreasonable restraint on trade. *See Max Garelick, supra* 105 R.I. at 147–49, 250 A.2d at 356–358. (contract which prohibited defendant from purchasing grain from Plaintiff's supplier for five years after expiration of plaintiff/defendant's supply contract found excessive, since plaintiff had no interest to protect other than a desire to be free of competition); *Mento, supra* 106 R.I. at 688–89, 262 A.2d at 842 (seller of barbershop who opened new shop within 2 miles of original business was not

---

**3.** The Court finds spurious Plaintiff's implication that Mr. Schiff's participation in production selection at Dial Media gave him invaluable information to which he was not otherwise privy. The factors which Dial Media uses in its product selection and advertising are nothing more than well-known advertising techniques. (*e.g.* use an attention-getting device early in the ad). Plaintiff disclosed nothing of a confidential nature which could have been used by Defendant to Plaintiff's detriment.

unreasonably in competition with plaintiff/buyer in any manner different than any other barbershop would compete). Plaintiff competes with other advertisers for available commercial time. Defendant is simply another competitor, among others, for that same time. Plaintiff has demonstrated no other possible interference with its business.

Sections 515 of the Original Restatement of Contracts and 188 of the Restatement (Second) of Contracts both presuppose a legal interest worthy of protection on the part of the promisee. Plaintiff has shown no legitimate distinct interest worthy of protection. Therefore, the question which arises from § 515(a) and § 188(1)(a) is easily answered. If no legitimate interest exists, a restraint is unreasonably in restraint of trade.

When a divisible covenant is found unreasonable, Rhode Island courts have held that the portion of the covenant which is reasonable may be enforced. *Max Garelick, supra* 105 R.I. at 146, 250 A.2d at 356. If an unreasonable clause may be "blue-lined" out, leaving a reasonable clause intact, the reasonable section will be enforced. *Id.* The Rhode Island State Supreme Court in *Max Garelick, supra* held,

> [T]hat where restrictive covenants contained in an agreement are divisible, the restraints set out therein will be valid to the extent that they are reasonably necessary for the protection of the interest of the person for whose benefit they are intended, are not unreasonably restrictive of the rights of the person who is restrained, and are not contrary to public policy. This in our opinion, is consistent with the majority view in this country.

*Max Garelick, Inc. v. Lanni, supra* at 148, 250 A.2d at 357 (citing *Welcome Wagon, Inc. v. Haschert,* 125 Ind.App. 503, 127

N.E.2d 103 (1955)). The covenant between Dial Media and Arthur Schiff is indivisible, however, because it does not contain discrete time or area restrictions, such that one restriction may be eliminated, and another retained.[4] Rhode Island has not yet ruled on whether indivisible terms of an unreasonable restrictive covenant may be rewritten by the court so as to be reasonable. *See Mento, supra* 106 R.I. at 690, 262 A.2d at 843 (explicitly did not reach issue whether excessive unseverable non-competition covenant could be rewritten). Other jurisdictions are divided on a court's power to rewrite the terms of a contract for the parties. *Compare, e.g., Rector-Phillips Morse, Inc. v. Vroman,* 253 Ark. 750, 489 S.W.2d 1 (1973) (indivisible, unreasonable covenant may not be modified) with *American Eutectic, supra* (modified time and areas limitations as well as activities restricted in employment contract, when original terms were excessive). In rewriting the employment agreement the *American Eutectic* court narrowly protected only the original employer's interests in preserving its business secrets and the good will built up with specific customers as to particular products. *See American Eutectic, supra.*

In the present case, however, the Plaintiff has not shown that any protectable interest such as trade secrets or good will has been abused.[5] The only proof which Plaintiff has presented is that Defendant is now engaged in the same type of business as that carried on by Plaintiff and therefore competes with Plaintiff for a limited amount of available television advertising time. There is no evidence or suggestion that Defendant is using trade secrets acquired while employed by Plaintiff or Plaintiff's customer lists, or trading on Plaintiff's reputation and good will. It is Plain-

**4.** The covenant in *Welcome Wagon, supra* restrained the promisor from competing against the promisee in three (3) discrete geographically designated areas. *Welcome Wagon, supra* at 506, 127 N.E.2d at 105.

**5.** Despite Defendant's admission that he does business with Urban General, one of Plaintiff's biggest competitors, Plaintiff has not demonstrated that Defendant gained any unfair competitive advantage due to his former employment at Dial Media, any more than a stranger would have, who had Mr. Schiff's background and experience. Since an employee is entitled to use general knowledge and expertise learned during his employment to continue his livelihood, Plaintiff has no interest in Defendant's future productivity to protect.

tiff's argument that if Defendant is permitted to ply his trade within 500 miles of Providence, Rhode Island, there will be less appropriate television advertising time available to it to sell its wares. To grant Plaintiff's request for injunctive relief would not protect a legitimate interest. Rather, it would merely prohibit competition by the Defendant, who is in substantially the same business position as other would be competitors who are strangers to the Plaintiff. Thus, any rewriting of the covenant in an effort to bring about a reasonable restriction would be futile.

## III. TERMINATION CLAUSE

Defendant has counterclaimed that his termination was wrongful and claims damages in the amount of his salary for the remainder of the year specified in the employment agreement. In order for the Defendant to prevail, he must show that his termination violated the terms of paragraph six of the October 17, 1979 agreement. That paragraph specifies that "[t]he Employer may terminate this agreement if after written notice to the Employee, the Employee continuously fails to perform the responsibilities and the duties assigned to said Employee by the Employer." Defendant received a number of written notices of dissatisfaction with his performance, over a period of time from April, 1982 through January, 1983. Mr. Schiff does not deny receipt of these notices and therefore, procedurally the termination was not in violation of the terms of the contract. Between April 1, 1982 and January 13, 1983, Mr. Schiff received more than twenty such notices in the form of "inter-office correspondence" from Mr. Crocker, Executive Vice President of Dial Media, Mr. Schiff's superior. Those notices expressed dissatisfaction with several aspects of Defendant's work performance as well as his failure to execute responsibilities and duties assigned to him. The dissatisfaction expressed in those notices ranged from the Defendant's failure to follow proper procedure in having art work done and not completing work in a timely manner to directly disobeying commands of his superior, Mr. Crocker. The notices show a continuing dissatisfaction on the part of Dial Media with Mr. Schiff's work. While Defendant disputed the correctness of certain notices, he has shown only the possibility of mistake as the source of certain problems for which Dial Media held him accountable, while other instances of Defendant's shortcomings are essentially undisputed. Therefore, this Court finds that Defendant did continuously fail to perform the responsibilities and duties assigned to him by Dial Media.

 Defendant presented evidence of various promotions and raises during the period over which he received the required written notices of dissatisfaction. He also points to a Tokyo trip given him and his wife in lieu of a Christmas bonus, as evidence that his performance was satisfactory, despite the notices. An employer, however, need not discharge an employee immediately, once it has become dissatisfied with the employee's performance of his duties, but may avail itself of the employee's performance under the contract at a later date, even if no new cause of dissatisfaction arises. *Hanaford v. Stevens & Co.*, 39 R.I. 182, 191, 98 A. 209, 212 (1916). Consequently, Dial Media's retention of Mr. Schiff over a period of time after expressing dissatisfaction with his performance does not preclude it from terminating him and from basing the termination on the earlier laxness in performance of duties. Mr. Schiff's failure to appear for some important appointments, his mistakes which cost the company time and money, along with his behavior at a December company function show a continuing failure to perform his assigned duties. These shortcomings could well have led Dial Media to believe that his conduct of his duties would continue to decline after he had made a decision to leave the company upon the expiration of his contract. In any event, the deficiencies in Mr. Schiff's performance which were noted in writing and given to him were adequate grounds for termination under the terms of the contract.

Accordingly, Defendant's counterclaim for an injunction and damages is denied. Plaintiff's claims for injunctive relief and damages is also denied.