**NESTLE FOOD COMPANY, Plaintiff,**

v.

**Stephen MILLER, Defendant.**

**Civ. A. No. 92–0656–BO.**

United States District Court, D. Rhode Island.

Aug. 25, 1993.

## DECISION AND ORDER

BOUDEWYNS, United States Magistrate Judge.

Plaintiff, Nestle Food Company ("Nestle") has brought this action seeking injunctive relief and damages against its former salesman, defendant Stephen Miller ("Miller").[1] Nestle contends that Miller is in breach of an employment agreement that prohibits him from engaging in sales activity on behalf of a direct competitor in his former territory. Nestle also contends that Miller has wrongfully used confidential or "trade secret" information belonging to Nestle in his present employment. After a trial on this matter, I find that Miller has breached his agreement with Nestle, and that Nestle is entitled to injunctive relief that reasonably protects Nestle's legitimate interests. Nestle has failed, however, to provide any reasonable basis upon which this Court may calculate damages, and therefore, Nestle is entitled to only nominal damages in the amount of one dollar.

### Facts

Before his resignation on June 27, 1992, Miller was employed as a salesman in the Fund–Raising Sales Division of Nestle. The Fund–Raising Sales Division sells chocolate and other types of candy to customers who then resell the products in order to raise funds for the particular customers' organization. The market of customers consists of a wide variety of organizations including after-school clubs, sports teams, religious organizations and business groups engaged in charitable endeavors. Miller was, at all times during his employment with Nestle, responsible for servicing customers in his assigned territory, which, for the most part, consisted of the State of Rhode Island.

In Rhode Island, there is a fund-raising sales "customer base" of approximately 2500 potential customers. Nestle normally sells to approximately 300 of these potential customers each year. Mr. Wilfred N. Gauthier ("Gauthier"), regional manager at Nestle and

W. James McKay, Adler Pollock & Sheehan, Inc., Providence, RI, for plaintiff.

Stephen C. Mackie, Mackie, McDonald & Romano, Providence, RI, for defendant.

---

1. The parties have consented to the trial of this matter before a Magistrate Judge pursuant to 28 U.S.C. § 636(c). *See also* Federal Rule of Civil Procedure ("FRCP") 73.

Miller's supervisor for a brief period before Miller resigned, testified that Nestle's competitors[2] frequently attempt to contact the same customers that are called upon by Nestle.[3] Many times the individual "contact person" or "decision-maker" in charge of fund-raising for the organization changes from one year to the next, and in that case, the salesman must attempt to locate the new individual. In any case, it is necessary for the salesman to call on the contact person each year in order to renew the sale.

Despite the efforts of Nestle and its competitors to retain customers from year to year, it is common for the customers to switch companies for any number of reasons.[4] This is reflected in Nestle's average annual retention rate (the percentage of customers that return to Nestle in the next year), which normally is between fifty to sixty percent.[5]

Part of Miller's job each year was to discover and compile sales information on behalf of Nestle. He kept records on how to find the particular "contact person" or "decision-maker" in charge of fund-raising for a community organization. He also compiled other relevant information such as the time of year the group usually makes its purchase, how much candy the group is likely to purchase, and what type of candy the group is likely to purchase.

As part of a company-wide effort, Nestle compiled the data collected by Miller together with similar data collected by other salesmen, data gained in response to direct mailings, customer calls on Nestle's toll-free number, and other types of customer referrals on to a computer database. From the database, Nestle was able to make printouts called "hit-lists." The hit-lists were then given back to the salesman to help them target the best customers during any specific time period. Each year, Nestle provided Miller with the "hit list" and other printouts. Even though Miller himself assisted in the gathering of the information, there is no real dispute that the lists, as well as the information contained in them, belonged to Nestle.

Miller enjoyed substantial success as a salesman at Nestle over his tenure of eleven years.[6] In the year before Miller began his employment at Nestle, sales at Nestle in Rhode Island were at a level of about $40,000. After Miller joined, in the first year, sales rose to a level of $100,000 to $150,000. The last year Miller was employed with Nestle, 1991–92, Miller was able to achieve over $500,000 in sales. As Miller testified, it is the high level of service, *i.e.*, prompt delivery of product, and other talents of the salesman that are the most important factors in retaining and increasing sales. The actual candy product sold by each company is essentially the same, and is not as important to the customer as the service provided by the salesman.

Miller executed an employment agreement with Nestle in January of 1992, for the period of January 1, 1992 to December 31, 1992. The relevant provisions of that agreement provide that, in exchange for continued employment at Nestle, Miller promised not to work for any third-party fund-raising compa-

2. Nestle's competitors in the Rhode Island fundraising market include Hebert, QSP, Cherrydale Farms, World's Finest Chocolate, and other companies who sell Hershey and M & M Mars candies.

3. In 1992, for example, Miller's replacement at Nestle, Robert Clarke, made a presentation to Fleet Bank on behalf of Nestle. Miller made a presentation to Fleet on behalf of Hebert. Miller ended up "winning" the account.

4. Among the most significant factors are the buying preferences of the "contact person" and the organization (*i.e.* buying non-candy fundraising items) and the talents of the salesman.

5. While the retention rate is usually between fifty and sixty percent the first year, approximately an additional ten percent "bounce back" the following year.

6. Miller was an experienced salesman prior to working for Nestle; indeed, he has spent his entire working life as a salesman. Most notably, Miller held a position working at QSP, the fundraising division of Reader's Digest, in the same territory he serviced for Nestle and currently services for Hebert, for a period of five years.

ny (in the territory he covered for Nestle) for a period of one year after leaving the employment of Nestle. Miller also acknowledged that the customer-related information, *i.e.* the information on the hit-lists, was confidential information and property of Nestle, and promised not to use any information for any purpose other than in furtherance of his Nestle job responsibilities.

Miller's direct supervisor at Nestle, Mr. David Taylor ("Taylor"), left his position at Nestle in December, 1991, and became the manager of the Fund–Raising Division of Hebert Candies ("Hebert").[7] Following Taylor's lead, Miller resigned his position with Nestle as of June 27, 1992 and within days was employed by Hebert's Fund-raising Division. At Hebert, Miller sells the same types of products, including confection, candies and chocolate bars, as he previously sold while employed by Nestle. Miller sells these candies to the same "customer base" of church groups, athletic leagues, and school clubs in the same territory he covered for Nestle. Miller admits to sending out direct mail advertising to at least 100 former customers of Nestle. Miller also admits to calling about fifty percent of the customers found on a list of twenty-five customers who purchased candies from Nestle in 1990–91, but switched to Hebert during 1991–92. There is no dispute that Hebert is a direct competitor of Nestle in the Rhode Island and southeastern Massachusetts fund-raising markets.

In addition to soliciting former Nestle customers, Miller has developed his own "hit list."[8] He uses the Rhode Island educational directory, town publications, telephone directories, Dun & Bradstreet lists, and various publications provided directly by the "customers." Further, he travels to various schools and obtains information about the clubs and organizations through the secretaries and the principals. Miller testified that his efforts have not been very successful; his overall gross sales since being at

Hebert have been about $100,000 (for approximately one year).

After Miller left Nestle, Nestle hired Robert Clarke ("Clarke"), on August 24, 1992, as a replacement. Clarke had little or no experience in fund-raising sales in the past ten years. Between the time that Miller left and Clarke started with Nestle, no salesman covered the Rhode Island territory. Clarke's supervisor was Mr. Gauthier (Mr. Taylor's replacement). Gauthier did not have any significant experience in the area of fund-raising sales either.

After Miller left, Nestle's sales in the Rhode Island territory dropped by approximately $233,000. Paul Weinstein ("Weinstein"), the Eastern Area Sales Manager, testified that the retention rate for 1991–92 was 56%, while the retention rate for 1992–93 was 32%. Weinstein blamed the low 1992–1993 rate on Miller's "taking" former Nestle customers, in violation of the January 1, 1992 employment agreement. In its complaint, Nestle asks this Court to award damages and injunctive relief barring Miller from using or revealing proprietary or trade secret information, and from working for a competitor for a period of one year.

*Discussion*

Miller entered into an employment agreement with Nestle on January 1, 1992, covering the period of January 1, 1992 through December 31, 1992. The relevant provisions of that agreement provide as follows:

*Competitive Activity*

As a condition of employment, you agree not to engage in or in any way assist any sales or similar related work or services for any third-party fund raising company or third party fund raising products of any kind during your employment and for a period of one year thereafter.... The post-employment restriction contained in this paragraph applies to your territory as

---

7. Taylor was *not* required to sign an employment agreement while at Nestle.

8. Miller denies that he retained any computer printouts or other hard copy version of information provided to him by Nestle. Nestle does not dispute this denial.

assigned at termination of your employment.

In the event the Company must resort to legal action as regards post-employment competitive activity, the one year period referenced above shall be extended so that such period shall begin on the date of termination of your employment and extend to the date which is one year from the date the court grants the Company's request for preliminary injunctive or other relief.

. . . .

### Confidential Information

You acknowledge and agree that customer-related information which you have received and/or will receive from the Company, including but not limited to the names and addresses of customers, key contacts at customers, customers expressions of interest in purchasing Company or other fund-raising products, information regarding customer buying habits and preferences and customer contact reports are confidential and proprietary to the Company whether or not such information (i) is received in written or oral form or (ii) is marked with any restrictive legend. Information regarding the Company's actual and prospective production processes, sales training, development and marketing techniques, pricing, promotional policies and/or terms and conditions of sales similarly is confidential and proprietary to the Company. You agree not to use any information designated in this Agreement as Company property or as confidential and proprietary to the Company for any purpose other than in furtherance of your responsibilities set forth above.

In essence, the agreement restricted Miller from: (1) working for a direct competitor for the period of one year after the termination of his employment in the same territory; and (2) using confidential, customer-related information which Miller came in contact with while at Nestle. Miller and the other salesmen were required to sign this contract each year or else they would have been terminated by the company. These provisions must be looked at to determine first if they have been violated, and second if they are enforceable against Miller in the factual context of this case.

### 1. Competitive Activity Provision

The "Competitive activity" provision in the January 1, 1992 agreement between Miller and Nestle restricted Miller from working for a direct competitor in the fund-raising sales market within the territory that Miller covered for Nestle at the time of his termination for a period of one year after his leaving Nestle. The facts as established by the testimony and exhibits clearly establish that this provision has been violated. Upon leaving Nestle, Miller worked for Hebert Candies, a direct competitor of Nestle, in the same territory, comprising Rhode Island and parts of southeastern Massachusetts. The issue now becomes whether this provision is legally enforceable.

This analysis must begin with mention that, under Rhode Island law,[9] noncompetitive covenants[10] are not favored by the courts, and are carefully scrutinized.[11] Such covenants are enforceable only to the extent they are reasonable.[12] The standard adopted by the Rhode Island Supreme Court is set forth in section 188 of the Restatement (Second) of Contracts.[13] Section 188 provides:

9. In an action such as this based on diversity of citizenship under 28 U.S.C. § 1332, the federal district court must apply the law of the forum in which it sits. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Walker v. Armco Steel Corp.,* 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980).

10. An agreement restricting an employee's future employment possibilities in order to prevent or limit the employee's ability to assist competitors is evaluated under the same analysis as a "noncompetitive covenant." *See* Restatement (Sec-

ond) of Contracts, § 188(2)(b) (1981); *Dial Media v. Schiff,* 612 F.Supp. 1483, 1488–89 (D.R.I. 1985).

11. *Id.*

12. *Home Gas Corp. of Mass. Inc. v. DeBlois Oil Co.,* 691 F.Supp. 567, 572 (D.R.I.1987).

13. *Id.* at 573; *Dial Media,* 612 F.Supp. at 1488–89.

(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonable in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.[14]

The "Competitive activity" provision involved in this case may be viewed as having three distinct purposes or interests. First, the provision protects Nestle's allegedly "confidential" and "proprietary" information. By prohibiting its salesmen from working for a competitor firm for the period of one year, its salesmen are less likely to utilize Nestle's confidential customer-related information for the benefit of the competitor firms because they simply would not have that employment opportunity. Second, the provision protects the "goodwill" or "special relationship" which the departing salesman developed with the customer on behalf of Nestle. It allows the replacement salesman time to renew the relationship with the customer without competition from the former Nestle salesman. In the words of Mr. Weinstein, the one year limitation gives the new sales associates "a fair chance to maintain [Nestle's] current customer base." Third, the provision protects Nestle from unfair and predatory competition by its competitors. By preventing its most experienced and productive salesmen from freely joining a competitor firm for one year, it reduces its competitors' ability to attract these salesmen to their employ, and thereby limiting its competitors' ability to unfairly increase sales.

■ In order for the Court to provide protection for any one of these interests, Nestle must first show that they are "legitimate." [15] The first interest, Nestle's protection of customer-related information, must be supported by a showing that the information is "confidential" and "proprietary" under the standard set forth in *Home Gas*.[16] Under the standard set forth in that case, whether or not information is "confidential" depends upon how readily ascertainable the information is to a person conducting an independent investigation. Information has been held to be confidential where it is not readily ascertainable through ordinary business channels.

The evidence in this case clearly establishes that the customer-related information is not readily ascertainable through ordinary business channels, and therefore Nestle has a legitimate interest in protecting this information. Nestle has expended significant effort over many years to sift through a universe of some 2500 potential purchasers to create a database of the names of organizations that would have regular fund-raising needs. The database also contains names and addresses of "contact persons," the time of year when the group would be expected to purchase, and the amount that the group would be expected to purchase. Often the salesman must talk to a number of people before locating the "contact person." As Miller admitted, the information may sometimes be difficult to obtain.[17]

Although Nestle has proven that protecting its confidential information qualifies as a "legitimate interest," it should also be noted that the trial testimony established that Nestle's customer information is not critical to a company wanting to build up its own "customer base" (such as Hebert). In the Rhode Island market, there are approximately 2500 potential customers in the fund-raising market. The most important initial information about these organizations is simply the organization's name and phone number, which is generally obtainable through town directories, yellow pages and other publications. From that initial information, a company could invest a reasonable amount of time and effort to obtain information about the identi-

---

**14.** Restatement (Second) of Contracts, § 188 (1981).

**15.** *Id.*

**16.** 691 F.Supp. at 574–75. *See also Colonial Laundries v. Henry,* 48 R.I. 332, 336–37, 138 A. 47, 48–49 (1927).

**17.** Although Miller helped in the development of the Nestle sales information, he did so as a paid employee of Nestle and as a part of his job responsibilities. Miller has no personal claim to any of this information.

ty of the "contact person" and the buying preferences of the organization.

Nor is the "confidential" or "proprietary" nature of the information as valuable to Nestle as Nestle would like this Court to believe. The testimony established that Nestle's competitors probably have much of the same information about the "traditional" fund-raising purchasers, and these competitors call on many of these same customers in competition with Nestle each year. Other information which Nestle lays claim to—the names and addresses of contact persons, the buying times, and the types of candy which the organization usually purchases—changes from year to year; and therefore quickly becomes obsolete. Finally, Nestle's commitment to protecting its "confidential information" is belied by the fact that other Nestle employees had access to this information— such as Mr. Taylor—but were not required to sign a competitive activity agreement.

All these factors seem to indicate that Nestle has a less important interest in protecting its confidential information than it does in protecting its "goodwill"—or the special relationship that its salesmen have developed with customers on behalf of Nestle. Indeed, the testimony established that the most important factors in making sales are simply the salesman's telephone call to the contact person each year and the advantage of utilizing the "special relationship" developed in previous years to close the sale.[18] There is no doubt that this "goodwill" with the Rhode Island customers, built up by Miller over the years on behalf of Nestle, is a legitimate interest; but for the purposes of this decision, it must be further identified as *the most crucial interest* so that a proper remedy can be narrowly tailored. Protection of confidential information and goodwill are the only legitimate interests established by the evidence.[19]

In order for the Court to enforce the "Competitive activity" provision, Nestle must establish that the provision is narrowly tailored to protect the legitimate interests of safeguarding either confidential information or goodwill, and it is not simply a restriction of the sales activity of one salesman in a competitor's employ. Nestle must also show that the restraint is reasonably limited in activity, geographic area and time.[20] Whether the restriction is *reasonable* and therefore enforceable must be decided on the facts of the case within the framework of these limitations.[21] Finally, Nestle must also show that the promisee's interests are not outweighed by the hardship to the promisor, and the restriction is not likely to injure the public.[22]

■ Under applicable case law, the restriction in this case is clearly reasonable because the time period is limited to one year and the territory covered is no broader than the territory covered by the salesman when he worked for Nestle.[23] There is, however, a fundamental problem with this provision. There has been no showing by Nestle that, in order to protect its legitimate interests, it is necessary to go to the extreme of prohibiting former employees from working for a competitor in their former territory for a period of one year.[24] This provision imposes a severe hardship on the departing salesmen,

---

18. Weinstein testified:
 What we find is if the new consultant had a chance to work with these customers and service them and they had the same success with the new sales consultant, he would maintain a loyalty to our customer, the old proverb if it ain't broke, don't fix it, but if the new consultant came in and serviced these customers and did a good job, they would have no reason to go to Hebert at that point. The theory is Mr. Miller was there and [Clarke] wasn't. That puts us back into a level playing field to compete with our former employees.

19. The desire to be free from competition, by itself, is not a protectable interest. *Dial Media,* 612 F.Supp. at 1489.

20. *Home Gas,* 691 F.Supp. at 573.

21. *Id.*

22. *Home Gas,* 691 F.Supp. at 575–76.

23. *See Home Gas,* 691 F.Supp. at 575. Restatement (Second) of Contracts § 188 comment d (1981).

24. On this subject, Weinstein simply commented that "it gives our new consultant a fair chance to maintain our current customer base."

who will have to change either their specific field of expertise or move to another location. Nestle has not established any real need to impose this burden; I have determined that Nestle's legitimate interests can be adequately protected by less draconian means.

Enforcement of a restrictive covenant should be narrowly tailored to precisely protect specifically defined interests of the former employer.[25] Nestle surely has a right to prohibit the use of its "confidential information" for the benefit of another company and a right to protect the "goodwill" or "special relationship" that exists with its customers. But instead of going to the extreme of prohibiting its salesmen from working for a competitor for one year, a more effective, practical and fair way for Nestle to protect this customer base is to prohibit its former salesman from: 1) *ever* revealing or using any "confidential information" learned while at Nestle,[26] and 2) *soliciting* the salesman's former customers for the period of one year. This modified provision gives Nestle's new salesman a fair chance to maintain his predecessor's "customer base" by preventing the former salesman from taking advantage of the special relationship the former salesman shares with Nestle customers, it protects Nestle's confidential information, and it gives the former Nestle salesman a chance to start fresh in a new company.

Even under this lesser standard, however, Miller clearly is in breach.[27] Nestle, therefore, is entitled to both injunctive relief and damages.[28]

### 2. Confidential Information Provision

The "Confidential Information" provision defines confidential information as "custom-

er-related information ... received ... from the Company, including ... names and addresses of customers, key contacts at customers, customers expressions of interest in purchasing Company or other fund-raising products, information regarding customer buying habits and preferences ... whether or not such information (i) is received in written or oral form or (ii) marked with any restrictive legend." This covenant basically prevents Miller from *ever* using any written or oral information he gained as a salesman for Nestle. As with the "Competitive activity" provision, the Court must first consider whether the provision has been breached, and then whether it is enforceable.

■ The testimony and evidence presented clearly show that Miller used Nestle's sales information for the benefit of his new employer, Hebert. During his first year at Hebert, Miller made a mass mailing to approximately one hundred accounts which he formerly serviced as a salesman for Nestle. He also initiated customer contact for approximately one half of the customers on a list of 25 Hebert current customers which were customers of Nestle during July 1991 through June of 1992. Miller is clearly in breach of this provision of his employment agreement because he used specific "customer-related" information, including specific customer names, addresses, and buying-times (lodged in his memory) for the benefit of Hebert.

Under the standard set forth in the Restatement (second) of Contracts, this Confidential Information provision, subject to a

---

25. *Home Gas,* 691 F.Supp. at 574.

26. *See* the discussion of the "Confidential Information" provision *infra.*

27. Miller actively solicited many former Nestle customers during his first year at Hebert. During his first year at Hebert, Miller made a mass mailing to approximately one hundred accounts which he formerly serviced as a salesman for Nestle. He also initiated customer contact for approximately one half of the customers on a list of 25 Hebert current customers, which were customers of Nestle during July 1991 through June of 1992.

28. Nestle also claims that Miller violated the Uniform Trade Secrets Act ("UTSA"). Rhode Island General Laws § 6–41–1 et seq. It is unnecessary to reach this analysis, however, because I have found that Nestle is entitled to the full extent of equitable relief available under its breach of contract claim. The only remedy provided for by the UTSA which is not available under the breach of contract claim is the possibility of double damages and attorneys fees where the misappropriation is found to be "willful and malicious." Plaintiffs have not sustained their burden on these elements; it is therefore unnecessary to consider whether the other *prima facie* elements of the UTSA have been satisfied.

reasonable construction with regard to other provisions in the employment agreement and the factual context of the case, is reasonable and therefore enforceable. First, as discussed *supra*, Nestle has a legitimate interest in protection of confidential information. Second, the restraint goes no further than is needed to protect the confidential information—it simply prevents Miller from ever revealing it or using it for the benefit of a direct competitor. Finally, Nestle's interest is not outweighed by the hardship to Miller or the likely injury to the public because this provision puts no significant burden on Miller and none on the public. Nestle is entitled to damages for Miller's breach of this provision and to injunctive relief.[29]

### 3. Defenses

■ Two issues have been raised by Miller in an attempt to defeat the breach of contract claims. He first argues that the covenants in issue do not survive upon termination. Specifically, he maintains that because the termination section provides that "certain provisions of this Agreement will survive its termination as set forth below," anything that is not "set forth below" does not survive. This is contrary to the express language of the agreement and to the normal rules of contract construction. The "Competitive activity" covenant expressly provides that Miller was not to engage in competitive activity

"during your employment *and for a period of one year thereafter....*" (emphasis added) Similarly, the "Confidential Information" covenant survives after termination as Miller was prohibited from using the information "for any purpose other than in furtherance of your responsibilities set forth above." Any other reading of these provisions would render them nullities.[30]

■ Miller also argues that there was no consideration for the covenants in the employment agreement. Even if there was no consideration[31] other than allowing Miller to continue as an employee with all of the associated benefits associated therewith, such continuation of employment constitutes adequate consideration.[32]

### 4. Counterclaim

■ Miller's counterclaim, as laid out in the complaint, appears to be based on a malicious prosecution theory. The elements of malicious prosecution in Rhode Island are: 1) institution of action maliciously, 2) without probable cause, and 3) an unsuccessful termination of the action.[33] Miller has failed to present *any* evidence in support of any of these elements. At trial, plaintiff's counsel claimed that his counterclaim is not one for malicious prosecution but, instead, is a "SLAPP" suit.[34] His counsel failed to pres-

---

29. The injunctive relief set forth below takes into account the reasonable construction of this provision as applied to the facts of this case, as set forth in the preceding footnote.

30. It is axiomatic that a court must construe a contract to give meaning and effect to each of its provisions. *See Crook v. Kalamazoo Sales & Service, Inc.*, 82 R.I. 387, 393, 110 A.2d 266 (1954), *overruled on other grounds, Flori v. Allstate Ins. Co.*, 120 R.I. 511, 513 n. 2, 388 A.2d 25, 26 n. 2 (1978).

31. It is clear that at the time the first contract containing such covenants was executed by Miller, consideration was in fact extended to him. Miller was given an income guarantee in return for executing the contract. In later years, Miller was given additional consideration such as the assignment of customers, as well as sales leads generated through Nestle's own efforts on an ongoing basis.

32. Rhode Island is an at-will employment state. An employee may be fired at any time, with or

without cause, excepting only limited statutory restrictions such as discriminatory discharges related to race, age or gender. Although Rhode Island has not decided the issue of continuing employment as consideration, ample support exists from other jurisdictions. *See, e.g., Mouldings, Inc. v. Potter*, 315 F.Supp. 704 (M.D.Ga. 1970); *Mattison v. Johnston*, 152 Ariz. 109, 730 P.2d 286 (Ariz.App.1986). Additionally, Nestle's stated intention to terminate Miller unless he would execute the covenant adds further support to the conclusion that consideration is sufficient. *Insurance Associates Corp. v. Hansen*, 111 Idaho 206, 723 P.2d 190 (Idaho App.1986).

33. *See Brough v. Foley*, 572 A.2d 63, 66 (R.I. 1990).

34. A "SLAPP" (Strategic Lawsuit Against Public Participation) suit is simply an acronym describing a lawsuit alleging recognized torts, typically defamation or tortious interference, filed in retaliation for another's lawsuit.

ent any evidence or any coherent legal basis for this claim. Judgment will be entered in favor of plaintiff on the defendant's counterclaim.

### 5. *Damages*

 Nestle requests that this Court award damages based upon its computation of the profits lost for approximately 25 customers who switched from Nestle to Hebert in Miller's first year as a salesman for Hebert. The Court in *Home Gas* ruled that plaintiff may recover as damages the loss of profits resulting from the wrongful solicitations to date.[35] However, the Court in *Home Gas,* emphasized the enduring rule that damages must be established by a reasonable certainty and may not be recovered if purely speculative. Plaintiff has failed to present any reasonable basis for determining that damages were suffered by Nestle as a result of Miller's wrongful solicitation of Nestle accounts, rather than some other factor.

The testimony presented at trial established that *25 out of approximately 300 former Nestle customers* switched to Hebert. These customers could have switched to Hebert for any number of reasons, however. Miller stated that he only actively called on approximately *one half* of the 25 customers, while at least *120* Nestle customers were statistically expected *not* to return to Nestle in any case.[36] Many of these customers are recognized in the industry as customers who traditionally purchase candy each year, and are frequently called on by other companies besides Nestle.[37] Many times the deciding factor about whom to purchase from is based simply on the *talent* of the salesman. The customers could have chosen Hebert simply because Miller's replacement at Nestle, Robert Clarke, was ineffective at making the sale. Further, there was no Nestle salesman at all in Rhode Island for approximately one month during July and August of 1992—the

Nestle customers could have chosen Hebert by default. In sum, Nestle's suggested computation of damages is entirely speculative. Accordingly, I award nominal damages in the amount of one dollar.

### 6. *Injunction*

 The Rhode Island Supreme Court, in *Durapin, Inc. v. American Products, Inc.,*[38] adopted the so-called "rule of partial enforcement." This rule allows the court to exercise its inherent equity powers to modify and enforce a covenant regardless of whether the unreasonable provision is severable from the other provisions in the agreement.[39] Under this rule, unless the circumstances indicate bad faith or deliberate overreaching on the part of the promisee, a court will attempt to modify an unreasonable covenant and enforce it to the extent that it is reasonably necessary to protect the promisee's legitimate interests, if that can be done without imposing undue hardship on the promisor or adversely affecting the public interest.[40]

As discussed above, I believe that Nestle does have a legitimate interest in protecting confidential information about current customers in its customer base, but more importantly it has an interest in protecting the "goodwill" or "special relationship" that its salesmen have built up with these customers. Therefore, the following injunction will enter against Stephen Miller:

1. Defendant Stephen Miller is enjoined, for the period of September 1, 1993, through August 31, 1994, from soliciting any customers who purchased Nestle fundraising products in the one year period prior to Miller's resignation from Nestle, in the territory he serviced at the time of resignation. "Soliciting" includes any type of contact initiated by defendant, including direct mail, telephone and personal contact, direct specifically at the former Nestle customer. If there is any question in

35. *Home Gas,* 691 F.Supp. at 578–79.

36. This figure assumes a 60% retention rate for 300 Nestle customers in the prior year.

37. Fleet Bank is an example of a purchaser recognized by, and called on, the competitors of Nestle.

38. 559 A.2d 1051 (1989).

39. *Id.* at 1058.

40. *Id.*

defendant's mind whether a certain customer was a customer of Nestle during that period, he may request this information in writing from an appropriate individual at Nestle, who shall respond within a reasonable time (not longer than three work days) after receipt of the inquiry.

2. Defendant is further permanently enjoined from using or revealing any confidential information (as defined in the January 1, 1992 employment agreement) retained by memory or otherwise which:

 a. was obtained *solely* by virtue of defendants' position with Nestle; *and*

 b. is not readily accessible through normal business channels (yellow pages, printed municipal publications and the like).

## Conclusion

For all of the foregoing reasons, the clerk is hereby directed to enter judgment as follows:

1. Nestle's claim for damages is granted in the amount of one dollar.

2. Nestle's claim for injunctive relief is granted as provided in this decision and order.

3. Miller's counterclaim is denied and dismissed with prejudice.