SAMUEL KORNSTEIN *vs.* ALMAC'S, INC.

JUNE 22, 1964.

PRESENT: Condon, C. J., Roberts, Powers and Joslin, JJ.

Powers, J. This suit in equity was brought to reform the terms of a lease, for rent owing by reason of said reformation, and for damages resulting from the respondent's breach of the covenant to keep the interior of the premises in good order and repair. It was heard on bill, answer and proof by a superior court justice, and thereafter a decree was entered denying and dismissing the bill but ordering payment of rent and adjusted taxes. The complainant appealed therefrom to this court, assigning as reasons in support thereof that the decree is against the law, the evidence and the weight thereof.

It is established by the pleadings and the evidence that complainant is the owner of a commercial building at 67 Main street, Woonsocket, and that respondent is a Rhode Island corporation engaged in the operation of supermarkets, so called.

It appears that on or about January 12, 1951, the parties entered into a written indenture of lease whereby respondent agreed to pay a minimum base rental of $12,000 annually for a term of seven and one-half years commencing from the date it took possession. It was further agreed that at the election of respondent the lease could be renewed for an additional seven and one-half years.

The provision relating to the right of renewal is contained within paragraph 6 of the lease and reads as follows:

"6. The Lessee shall be entitled to the privilege of renewal of this lease for a period of seven and one-half (7½) years, and such renewal shall be subject to the terms and conditions herein expressed, except as to this covenant of renewal. The Lessee, by continuing to occupy the leased premises, after the expiration of the original term of its tenancy hereunder, shall be deemed and considered to have elected to avail itself of its then current right to renew this lease, unless it shall have notified the Lessor to the contrary by registered mail on or before January 1, 1958. By such continued occupancy alone, and without any further con-

tract or agreement, this Indenture of Lease shall be renewed and the leased premises shall be deemed and considered to have been again demised by the Lessor to the Lessee, for the term of seven and one-half (7½) years, beginning upon the day following the date of the expiration of the Lessee's immediately preceding tenancy, subject to all of the terms and conditions herein contained, except as to the option of renewal."

On July 22, 1951, respondent took possession of the premises for a tenancy which, unless renewed, terminated on January 21, 1959. The respondent found the existing incandescent lighting unsatisfactory for its purposes and, having given notice, removed the old fixtures, replacing them with the type used in fluorescent lighting. It was necessary to do some rewiring and, because of the type of fixtures used in fluorescent lighting, to cut holes in the ceiling which was of white metal. The fluorescent fixtures were attached to a canopy stem which went through the hole in the metal ceiling and was affixed to the wooden beams by wood screws. There were seven rows of fixtures and twenty fixtures to each row. Further, there were two stems to each fixture. The ceiling was in three levels, hence the stems were of different length so as to achieve uniformity in the height of all fixtures from the floor.

The holes cut in the metal ceiling were three to four inches in diameter. The opening of the hole around each stem was covered by a cuplike device so that, with the fixtures in place, no holes were visible. After installing fluorescent lighting, respondent painted the ceiling black to obtain maximum efficient lighting.

Extensive rewiring was also required to accommodate respondent's refrigeration and power needs. There were three panel boxes containing switches and fuses when respondent took possession, but the rewiring installed by it called for the installation of new equipment.

It further appears that respondent succeeded United Public Markets, Inc. as a tenant. Apparently during its

tenancy conveyor tracks, washtubs, vegetable bins and like accessories common to a market had been installed, and were used by respondent, and left behind when it moved.

In addition to the basic minimum annual rental, respondent agreed to pay a graduated percentage on its sales and one half of all increases in real estate taxes above $3,500 each year of its tenancy.

By letter dated February 24, 1958, respondent advised complainant that there was some probability it would not elect to renew its lease at the end of the original tenancy, but that things might change and suggested further discussion. On September 5, 1958, respondent again wrote to complainant, reminded him of the thoughts expressed in the February 24 letter, noted that it had not had any response from complainant, indicated that it would not renew and offered to sell all of its equipment to any new tenant and to assist in procuring such a tenant.

Thereafter during a conversation between complainant and Allen W. Pike, then president of respondent corporation, complainant advised respondent that, having received no written notice by January 1, 1958, he considered respondent to have exercised its option. In his testimony, complainant stressed that by reason of conversations between the parties during negotiations he believed that such was the intention covered by paragraph 6 of the lease.

On November 26, 1958, referring to his letters of February 24 and September 5 and their subsequent meetings, Mr. Pike again wrote to complainant stating that respondent's operations would close November 29 and it would proceed to move its equipment out within a few days. All of the equipment respondent was claiming had been removed by December 21 and the keys delivered to complainant on December 23, 1958.

The bill avers and complainant testified that during negotiations in the summer and fall of 1950 it was understood

by all parties that complainant was to have written notice on or before January 1, 1958 if respondent did not intend to exercise its option to renew. By mutual mistake, however, he contended, the exact language as contained in paragraph 6 failed to express the intention of the parties and prayed that the language therein be reformed to read as follows:

> "Unless the Lessee shall notify the Lessor by registered mail on or before January 1, 1958 of its intention to terminate the within lease upon the expiration of the original term hereof, this lease shall automatically be renewed for a term of seven and one-half (7½) years, beginning upon the day following the day of the expiration of the Lessee's immediately preceding tenancy, upon the same terms and conditions hereof, except that there shall be no further right of renewal."

The bill further avers that if the foregoing language was not omitted by mutual mistake, it was omitted by mistake of complainant induced by fraud on the part of respondent.

The trial justice found that complainant had failed to prove either mutual mistake or fraud with regard to the exact terms by which respondent was bound to exercise its option and denied complainant's prayer that paragraph 6 of the lease be reformed so as to conform with complainant's contention as to what had been the original intention of the parties.

We have, therefore, independently reviewed the evidence and have reached the conclusion that he was not in error. It is not seriously disputed that the first draft of a proposed lease was prepared by complainant's counsel. This draft was used in subsequent meetings between the parties as a basis for the preparation of the draft which was finally executed. Although the final draft was actually drawn by counsel for respondent, the language as it appears in paragraph 6 thereof is identical with that used by complainant's counsel in a preliminary agreement. Indeed, the final draft was read by complainant prior to his signing and some

changes were made which he initialed, but no change in the phraseology of paragraph 6 was ever considered. He conceded reading it before signing and it is apparent to us from his testimony that he believed the phraseology accurately expressed the option requirements that he now claims to have been agreed upon orally.

It is clear, however, that the language does not lend itself to the construction which he then placed upon it. It expressly provides that if respondent held over, it would be deemed to have renewed the lease, unless prior to January 1, 1958 it had advised complainant of its intention not to renew.

The complainant argues, however, that it is clear from the evidence that the language of paragraph 6 is not that mutually intended by the parties. We cannot agree. Although we do not have the advantage of having observed and heard the parties as they testified, we cannot find from a careful review of the record that the evidence preponderates in his favor. The parties flatly contradict each other as to prior preliminary conversations and their testimony seems to us to carry equal plausibility. It is well settled that a complainant in equity who seeks to have an instrument reformed on the basis of mutual mistake must establish such mistake by clear and convincing evidence. *Vanderford v. Kettelle,* 75 R. I. 130. In *Diman v. Providence, Warren and Bristol, R. R.,* 5 R. I. 130, 135, Chief Justice Ames speaking for this court pointedly observed, "If the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it, as it was written, by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement of the parties as it was before; and the court would have been engaged in the singular office, for a court of equity, of doing right to one party, at the expense of a precisely equal wrong to the other."

In the instant cause, we are persuaded from the evidence as we view it that the language of paragraph 6 expressed the understanding entertained by respondent but was misconstrued by complainant. Nor can we find that respondent was guilty of fraudulently misleading complainant into a belief that paragraph 6 stood for the proposition for which complainant now contends. His attorney was not only present in all preliminary negotiations but was the author of the exact language finally adopted by the parties.

The bill of complaint further avers that respondent has refused to pay its share of increased real estate taxes as provided in the lease. It also avers that, by removing electric light fixtures, wiring and other electrical equipment installed by it, at the same time failing to restore the premises to the condition existing when it took possession, it put complainant to great expense. The bill prayed for relief in both particulars. It also prayed for rentals due under the lease, presumably on the theory that respondent had exercised its option by holding over, but contains no averment to that effect.

The respondent readily conceded that it owed complainant for an adjustment of taxes and for rent from the end of the year 1958 to January 21, 1959 in the sum of $677.42.

The record discloses that respondent sent checks to complainant for each such item shortly after it quit the premises but they had been returned. It further appears that complainant refused to accept said checks for the reason that they purported to be in full payment of respondent's indebtedness.

The trial justice denied all of complainant's prayers save that relating to rent and taxes, and pursuant to his decision entered the following decree:

"1. That said Bill of Complaint be and the same hereby is denied and dismissed; except that the respondent shall pay to the complainant the sums which

the respondent admitted to be due for rent and tax adjustment as follows:

"For rent $677.42
(with interest at 6% from December 31, 1958)
"For adjustment of taxes 3,024.91
(with interest at 6% from June 19, 1959)"

In his decision the trial justice, having denied the prayer to reform the lease, observed that the prayer relating thereto set forth the only ground for equitable relief contained in the bill of complaint. He went on to add that assuming such other prayers could be considered, complainant had not made out a case for the damages sought. He noted that complainant made no claim based on the lighting system in existence at the time respondent took possession, but was rather claiming that he was entitled to the fluorescent lighting fixtures and equipment installed by respondent. He held that they were mere fixtures which remained the property of the lessee and the removal of them by it was proper.

The respondent in its brief and oral argument also raises the question of the trial justice's jurisdiction to consider the prayers for incidental relief when complainant failed to prevail on the prayer for reformation.

Rule No. 72 of the superior court authorizes a respondent in equity to demur to the bill as a whole or to parts thereof, thus permitting an answer where a demurrer would not lie or contrariwise as the case might be.

It is an established rule that where a respondent is content to go to trial on the issue of fact raised by his answer, he is precluded thereafter from challenging the jurisdiction of the court. *Setchell Auto Parts Inc.* v. *Artamian & Sutcliffe Inc.*, 50 R. I. 144, and *Bosworth* v. *Bosworth*, 53 R. I. 389.

The instant respondent demurred to no part of this bill but was content to answer each and every averment, expressly denying the averment numbered 16 which charges that respondent removed complainant's fixtures without his

consent and quit the demised premises without replacing them.

The provision of the lease to which this allegation relates is contained in subparagraph d of paragraph 2 thereof. The trial justice in denying this prayer clearly had in mind subparagraph g which relates to structural changes only. We believe this to be so because in his decision he distinguishes between fixtures and structural changes, referring to the lighting equipment as "typical of fixtures as between landlord and tenant." He added that he thought respondent had a right to remove them and found that it had not damaged the premises in the process.

Clearly, the trial justice was referring to the fixtures installed by respondent. The gravamen of complainant's averment, however, went to the issue of respondent's obligation to leave the premises in as good condition as it found them. We cannot agree with the trial justice's finding that, with the condition prevailing after respondent had removed its fixtures, complainant had suffered no damage.

The evidence discloses that a white metal ceiling had been painted black to suit respondent's purposes; that numerous holes of three to four inches in diameter, possibly as many as 280 such holes, were cut into the metal ceiling; that some of the stems had been removed, others had been cut off at varying lengths; that some of the wires leading to the fixtures had been cut so short as to affect the security of the entire wiring system; and that some parts of the metal ceiling had fallen in the process of removing the fluorescent lights. In the words of an electrical contractor who inspected the premises for complainant after respondent had quit them, the fixtures had been removed in "The cheapest and fastest way to get them out."

There is, of course, evidence offered by respondent tending to minimize deterioration, but it is clear to us, from all the testimony, that respondent did not leave the prem-

ises in as good condition as that for which it was responsible.

We hold, therefore, that the trial justice erred in denying complainant's prayer for damages sustained in connection with the lighting system and the ceiling. There is, however, an insufficiency of evidence to support a finding by this court as to the amount of the damages in question. Therefore on this issue only the cause should be remanded to the superior court for determination of that question.

The complainant's remaining contention that the trial justice also erred in denying damages for accrued rentals under the lease as executed is totally without merit. This claim is based on the argument that even if the prayer for reformation should be denied, respondent elected to renew for an additional seven and one-half years by holding over. Although it would appear that the evidence to which complainant points in support of this contention is totally lacking in probative force, we need not inquire whether such is the case.

There is no averment to this effect in the bill of complaint and respondent had no opportunity to reply to the claim now being made. In *Dolan* v. *Dolan,* 78 R. I. 12, this court held that a bill of complaint which is clearly and intentionally framed to obtain certain definite relief based on specific allegations of fact cannot ordinarily be transformed into a bill seeking other relief, particularly when based on a theory apparently foreign to that of the bill as drawn.

At page 19 in the *Dolan* case, this court quoted with approval from *Rubber Company* v. *Goodyear,* 76 U. S. 788, 793, as follows: " 'In equity, the proofs and allegations must correspond. The examination of the case by the court is confined to the issues made by the pleadings. Proofs without the requisite allegations are as unavailing as such allegations would be without the proofs requisite to support them.' "

328

No allegation appearing in the instant bill, and such a claim as is now made being inconsistent with recourse to the equitable doctrine of reformation, the evidence which complainant suggests as proof that respondent held over would avail him nothing even if conclusive.

However, although the trial justice was warranted in denying the prayers for relief, except as herein determined to the contrary, it was inconsistent for him to have granted any relief and at the same time deny and dismiss the bill. Having dismissed the bill he was without jurisdiction to order payment of unpaid rent and adjusted taxes as he did. Rather, he should have denied those prayers where his findings were adverse to the complainant, granted those as to rent and taxes, and entered a decree accordingly. It is as though such was the disposition in superior court that we have considered the instant appeal.

The complainant's appeal is sustained in part and denied in part. The cause is remanded to the superior court for a hearing and determination as to the amount of the damages in question and for entry of a new decree thereafter sustaining the bill in part in accordance with this opinion.

*Aisenberg, Decof & Dworkin, Leonard Decof,* for complainant.

*Hart, Lark & Lovell, Hoyt W. Lark, Walter F. Gibbons,* for respondent.