[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Introduction
This action involves a dispute between the estate of the late William W. DePasquale (the "Estate") and the decedent's surviving brother, defendant Robert DePasquale (the "defendant"), over the buy-out provisions of a partnership agreement between the two brothers. The Estate has moved for summary judgment, seeking entry of judgment as to the value of the decedent's partnership interest and to compel defendant to make payment in accordance with the buy-out provisions of the agreement.
Facts and Procedural History
Robert and William DePasquale were the sole general and limited partners in a real estate partnership in Rhode Island known as R W Realty Co.("R W"). R W was formed in 1976 by a partnership agreement which was amended on February 21, 1985, February 23, 1990, May 15, 1990 and July 16, 1990 (the "Partnership Agreement"). The assets of R W consist primarily of five parcels of improved and unimproved real estate (the "Property").
William DePasquale died on August 11, 1990. The Partnership Agreement provides that, upon the death of a partner, the remaining partner must buy out the interest in R W of the deceased partner, pursuant to the formula contained in Section 10.2 of the Partnership Agreement. As R W's major assets consist of real property, the key component of the formula is the value to be accorded the Property.
Section 10.2 of the Partnership Agreement sets forth the method for arriving at the fair market value of the Property. It provides, in relevant part, as follows:
. . . [I]n . . . computing the Partner's Value in accordance with the terms hereof, all real estate, together with all buildings and improvements thereon, owned by the partnership on the date of valuation of the partner's interest shall be valued at its fair market value, which said fair market value shall be determined by the Partners within ninety (90) days of the close of each fiscal year. In the event that the Partners fail to agree to the fair market value of the real estate within 90 days after the close of the Partnership's fiscal year, then the value shall be determined by an independent appraisal conducted by a qualified appraiser mutually agreed upon by the Partners. In the event that the value of the real estate was determined in accordance with this Section 10.2 for the fiscal year immediately preceding the year in which a Partner dies . . . (The Value Before Year of Death. . .), then the value of the real estate for purposes of the Agreement, as amended . . ., shall be the Value Before Year of Death. . . . In the event that the value of the real estate was not determined in accordance with this Section 10.2 for the year immediately preceding the year in which a Partner dies . . ., then the value of the real estate . . . shall be the fair market value of the real estate, as of the date of the Partner's death . . ., as determined by an independent appraiser mutually agreed upon by the surviving partner and the Legal Representative of the deceased Partner. . . . In the event . . . said parties are unable to agree to the selection of an appraiser within sixty (60) days from the date of death of a Partner . . ., the surviving Partner and the Legal Representative . . . shall, within ten (10) days of such disagreement, each select an appraiser. The two (2) appraisers shall then forthwith select a neutral third appraiser and the determination of the fair market value of such real estate as agreed upon by the majority of such appraisers shall be binding and conclusive between the parties. The appraisers shall determine said fair market value within forty-five (45) days of the date of their selection. Each party shall bear the cost of the appraiser selected by him. However, the cost of the sole or third appraiser, as the case may be, shall be borne equally between the parties.
It is undisputed that, at the time of William DePasquale's death, there existed no determination of the fair market value of the Property for the year preceding his death either based on an agreement between the brothers or an appraisal performed by an appraiser mutually agreed to by them. In the spring of 1990, before his brother's death, Robert DePasquale hired Peter Scotti, on his own behalf, to appraise the Property. He agreed to forward the appraisal to the Estate upon receipt. In September 1990, Scotti submitted an appraisal of the Property to Robert DePasquale, totalling $21,265,500. Robert DePasquale forwarded the appraisal to the Estate, cautioning that it contained many inaccuracies and would be revised.
In October 1990, the Estate retained William Coyle to review the Scotti appraisal. In February 1991, Coyle completed his review of the Scotti appraisal and concluded that he was in general, but not complete, agreement with it. In June 1991, Scotti issued his revised appraisal of the Property, totalling $16,480,000.
On July 3, 1991, the Estate's attorney wrote to counsel for Robert DePasquale to suggest that the parties hire a third appraiser, per the terms of the Partnership Agreement. Counsel for Robert DePasquale responded, on July 9, 1991, as follows:
 [m]ight I suggest that prior to the parties proceeding to the immediate appointment of a third, neutral appraiser, that we afford Coyle and Scotti the opportunity to meet to review and analyze the subject appraisals in order to determine how "far apart" the parties actually are with respect to same. This might avoid some (or all) of the expense and time involved in having a third appraiser participate in the process. Of course, if we must proceed to that stage, we shall, but I do not believe it necessary at this time.
Initially, counsel for the Estate refused to agree to the proposed meeting between Coyle and Scotti. On July 30, 1991, however, he wrote counsel for Robert DePasquale, purportedly confirming an earlier agreement the two attorneys reached by phone, and stated as follows:
 The Executors of the Estate have agreed, and it is my understanding that Bob DePasquale has also agreed, that the appraisers previously selected by Mr. DePasquale (Peter Scotti) and by the Executors (William E. Coyle) may meet between this date and August 16, 1991 for the purpose of explaining to each other their respective opinions as to the values on August 11, 1990, of the properties listed above, and to determine whether they can agree on the value of any or all of the listed properties. The said appraisers are to be specifically instructed that they are not to negotiate in an attempt to arrive at "compromise" values, but they are to try to identify "errors" which either may have made previously in arriving at their respective valuations to the end that they can come together on what each believes to be the objective value of any of the properties. The said appraisers are to report in writing to you and me not later than August 19, 1991, setting out the agreed values of those properties where agreement has been reached and identifying those properties on which they have been unable to agree. . . . The Executors and Bob DePasquale will be bound by any such agreed values and will cooperate fully in the selection of a third appraiser to determine the values of the unagreed properties following the ground rules which I faxed to you on July 23, 1991, with such modifications as you and I may determine are appropriate.
On August 20, 1991, Coyle and Scotti wrote the parties to confirm that they had met for the purpose of discussing the value of the Property. They confirmed, in a letter signed by both of them, that, based on those discussions, they had reached agreement on the value of the Property in the total amount of $17,790,000.
The parties dispute, in affidavits and counteraffidavits, the purpose and effect of the meeting between Scotti and Coyle. The Estate, through the affidavit of its counsel, contends that the parties agreed to be bound by any agreement as to value reached by Scotti and Coyle and to forego the involvement of a third appraiser as to any properties on which the appraisers agreed as to value. Defendant Robert DePasquale contends, through his own affidavit and that of his counsel, that the parties simply agreed that, after the meeting between the appraisers (which was designed to discuss and resolve underlying errors in the previous appraisals), defendant Robert DePasquale would be bound by Scotti's appraisal and the Estate would be bound by Coyle's appraisal. These affidavits suggest that the appraisers were not authorized to compromise their numbers and that defendant Robert DePasquale did not agree to be bound by agreed values as between the appraisers. Defendant Robert DePasquale maintains that, notwithstanding any agreements reached between the two appraisers, he did not waive and can insist on his right, pursuant to the Partnership Agreement, to involve a third appraiser in the appraisal process.
Since late 1991, the parties have remained at impasse. As a result of their disagreements, no third appraiser has been brought into the process.
The Estate commenced this litigation to enforce the terms of the Partnership Agreement and seek damages for breach of that agreement by defendant Robert DePasquale. The defendant has counterclaimed seeking specific performance of the provision of the agreement requiring the appointment of a neutral third appraiser and for reformation of the pay-out provisions of the agreement.
Discussion
Summary judgment is an appropriate remedy when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Holliston Mills, Inc. v.Citizens Trust Co., 604 A.2d 331 (R.I.) 1992). The trial court, in determining whether genuine issues of material fact exist, must view the pleadings, affidavits and other relevant documents in the light most favorable to the non-moving party, and the burden is on the party opposing the motion to establish that a genuine factual dispute exists. Pacheco v. MassachusettsCasualty Insurance Co., 610 A.2d 111 (R.I. 1992). Genuine issues of material fact precluding summary judgment do not arise if the issues purportedly raised in the pleadings, affidavits and other relevant documents have no bearing on the outcome of the case.Lippman v. Kay, 415 A.2d 738 (R.I. 1980).
A. The Valuation of the Property
In moving for summary judgment as to the value of the decedent's partnership interest, the Estate argues that the Partnership Agreement, as written, has been complied with as a matter of law as a result of the agreement between the parties' respective appraisers as to the fair market value of the Property. The Estate contends, alternatively, that the parties modified the terms of the Partnership Agreement by a subsequent oral agreement in which they agreed to forego the hiring of a third appraiser and to be bound by the valuations assented to by their respective appraisers.
Defendant Robert DePasquale argues that the Partnership Agreement mandates the involvement of a third appraiser and that the parties either must retain a third appraiser, as the Partnership Agreement requires, or modify the terms of the Partnership Agreement. As it is undisputed that a third appraiser has not been hired and as, according to defendant, there are disputed issues of material fact as to whether the parties modified the Partnership Agreement, defendant contends that summary judgment is inappropriate.
Resolution of the Estate's motion for summary judgment requires an examination and interpretation of the Partnership Agreement. The Court first must decide whether, as a matter of law, the parties can be bound by a determination of the fair market value of property that is agreed to by their respective appraisers, notwithstanding the absence of a third neutral appraiser in the valuation process. If the Partnership Agreement can be interpreted to bind the parties to such an agreement, the question then becomes whether the parties' appraisers in fact reached such an agreement. If the Partnership Agreement cannot be interpreted to allow for the parties to by-pass the third appraiser requirement, then the issue becomes whether they in fact modified the agreement to allow their own appraisers to reach an agreement as to fair market value without involving a third neutral appraiser.
Contract interpretation presents, in the first instance, a question of law that is within the exclusive province of the court to decide. Fashion House, Inc. v. K-Mart Corp., 892 F.2d 1076
(1st Cir. 1989). Where a contract is to be construed on its terms alone, it is the court's duty to interpret the contract as a matter of law and only when the contract terms are ambiguous does a construction of those terms become a question of fact.Judd Realty, Inc. v. Tedesco, 400 A.2d 952 (R.I. 1979). A court must favor interpretations which give meaning and effect to every part of the contract and reject those which reduce words to mere surplusage. Systemized of New England, Inc. v. SCM, Inc.,732 F.2d 1030 (1st Cir. 1984). If the contested provision of an agreement can be interpreted in more than one way, the court should adopt the most equitable construction. Vickers Antone v.Vickers, 610 A.2d 120 (R.I. 1992). If the words of a contract taken literally defeat the parties' intentions, the court should interpret them consistent with the general intent of the parties, as gathered from their relative positions and surrounding circumstances. Dial Media, Inc., v. Schiff, 612 F. Supp. 1483
(D.R.I. 1979).
The terms of the Partnership Agreement are clear and unambiguous. Section 10.2 contemplates an annual valuation of the partnership realty whereby the partners either agree to fair market value within ninety (90) days of the close of the partnership's fiscal year or agree to the hiring of a single appraiser to valuate the Property. Should a valuation of the Property not have been determined for the year immediately preceding the year in which a partner dies, the Agreement provides a procedure for determining, upon death, the fair market value of the Property as of the date of death.
It calls first for the parties to mutually agree to the selection of an independent appraiser, within sixty (60) days of the date of death. If they cannot agree to the selection of an appraiser within that timeframe, they each must select their own appraiser within ten (10) days of their disagreement. Their respective appraisers then must select forthwith a neutral third appraiser. The determination of fair market value of the Property as agreed upon by the majority of such appraisers is binding and conclusive as between the parties. The appraisers are given forty-five (45) days from the date of their selection to determine fair market value. If the parties agree to the hiring of a single appraiser, they split the cost. If they each select their own appraisers, they bear their own costs. The cost of a third appraiser is borne equally between the parties.
Section 10.2 of the Partnership Agreement is designed to ensure a quick, fair and inexpensive valuation process, where the involvement of outside appraisers either is avoided or minimized. To avoid the delay and expense associated with outside appraisers, the parties are encouraged to agree to fair market value or to involve as few outside appraisers in the process as necessary. Strict deadlines are imposed to ensure that a determination of the fair market value of the Property, whether made by the agreement of the parties or by one or more appraisers, is made quickly. The intent of the provision is to guarantee that the surviving partner effectuates a speedy buy-out of the deceased partner's interest, at a fair price, for the benefit of the decedent's estate.
The purpose of requiring a third neutral appraiser to participate with the parties' respective appraisers in the appraisal process is two-fold: (1) it encourages the parties to agree to value or to a single appraiser to avoid the delay and expense associated with multiple appraisers; and (2) it creates a mechanism for brokering an agreement as to value with the parties' respective appraisers in order to reach a quick valuation and avoid impasse. Implicit in this provision of the Partnership Agreement is the assumption that, if the parties are unable to agree as to fair market value without the aid of an appraiser and are unable to agree to a single appraiser, it is unlikely that appraisers hired by each of them respectively would agree as to value; rather than consuming unnecessary time to find out, the Agreement simply includes a third neutral appraiser in the process from the outset to ensure that a determination as to fair market value is reached quickly. While theoretically it might be true that the result of a three-party negotiation might differ from a two-party negotiation, I do not believe that it was this synergy between three appraisers (one of them neutral) that drove the parties to require a third neutral appraiser to be involved in the appraisal process from the outset; the purpose was to ensure the quickest valuation process in a situation where neither the parties nor their appraisers could agree as to value.
It is entirely consistent with the express terms of the Partnership Agreement to recognize an agreement as to value between the parties' respective appraisers, without the intervention of a third neutral appraiser, as being binding and conclusive as between the parties. Such an agreement preserves the role of each party in the valuation process and minimizes the cost and delay associated with hiring a third appraiser. To interpret the Partnership Agreement as requiring the parties to hire a third neutral appraiser where their respective appraisers have agreed already on fair market value would be to impose upon the parties additional delay and expense, with no corresponding benefit, in contravention of the intent of the Partnership Agreement.
Indeed, to require the involvement of a third neutral appraiser after the parties' respective appraisers have reached agreement as to fair market value would be to compel a useless act. The Partnership Agreement dictates that, even when three appraisers are involved, the determination of the fair market value of the property, as agreed upon by "the majority of such appraisers," shall control. An agreement as to value between the parties' respective appraisers would be binding on the parties, therefore, even if a third neutral appraiser were later injected into the process, as it would constitute an agreement of "the majority of such appraisers." The third neutral appraiser could do nothing to affect the majority agreement as to value already reached between the parties' respective appraisers.
The parties could not have intended, in entering into the Partnership Agreement, to require the retention of a third neutral appraiser where their respective appraisers already had reached an agreement as to the fair market value of the Property. Such a requirement would fly in the face of the essential thrust of the valuation provisions of the Partnership Agreement: to effect a quick and inexpensive valuation of the Property, involving as few appraisers as possible, that is fairly reflective of the interests of the surviving partner and the Estate.
In short, the Partnership Agreement does not require the surviving partner and the Estate of the deceased partner to hire their own appraisers and to share in the hiring of a third neutral appraiser to determine the fair market value of the Property in every situation in which they are unable to agree as to a single appraiser. The appraisal provisions of the Partnership Agreement are satisfied by an agreement as to value reached by the parties' respective appraisers, notwithstanding their failure to include a third neutral appraiser in the valuation process.
Here there is no dispute that the parties have failed to follow the appraisal process outlined in the partnership agreement. The Estate and defendant Robert DePasquale did not agree to the selection of a single appraiser within sixty (60) days from the date of death. Under the provisions of the Partnership Agreement, therefore, the parties each were to select an appraiser within ten (10) days, and then the two appraisers were to select forthwith a neutral third appraiser, with the determination of fair market value of the Property as agreed upon by the majority of such appraisers to be binding and conclusive between the parties.
Defendant Robert DePasquale hired Peter Scotti to appraise the Property. The Estate hired William Coyle, as its appraiser, to review the Scotti appraisals. Neither party insisted that its appraiser join with the other party's appraiser to select a third neutral appraiser before proceeding with the appraisal process. After Scotti had completed his initial appraisal, Coyle had reviewed it and Scotti had submitted a revised appraisal, the two appraisers met to discuss their opinions as to the fair market value of the Property. Neither party objected to that meeting, even though a third neutral appraiser had not been selected to participate in the meeting. When the two appraisers met, they discussed their opinions as to value. Significantly, the appraiser hired by the Estate (William Coyle) and the appraiser hired by defendant Robert DePasquale (Peter Scotti) reached an agreement as to the fair market value of Property. Neither party disputes the fact that its appraiser agreed with the opposing party's appraiser as to the fair market value of the Property. To date, this process has saved each party the cost and delay associated with hiring a third appraiser.
I find, therefore, that the appraisers retained by the respective parties reached an agreement as to the fair market value of the Property that is binding upon the parties pursuant to Section 10.2 of the Partnership Agreement. Whether the two appraisers reached this agreement by way of negotiation and compromise is immaterial — that is precisely the process that the Partnership Agreement contemplated were the parties to have involved three appraisers in the valuation process.
It likewise is immaterial that the two appraisers reached this agreement without involving a third neutral appraiser in the valuation process. The intent of the Partnership Agreement is to encourage agreements between the parties as to fair market value without the attendant cost and delay associated with multiple appraisers. If the parties allow their own appraisers to proceed without the involvement of a third neutral appraiser, and their own appraisers agree as to value, they are bound by that agreement. They do not have to formally agree to be bound; the Agreement makes them bound as a matter of law.
Having determined that the agreement as to fair market value reached by the parties' respective appraisers binds them as a matter of law pursuant to the language of Section 10.2 of the Partnership Agreement, as interpreted by this Court, there is no need to reach the issue of contract modification. Accordingly, the parties may proceed to calculate the value of the decedent's partnership interest as of the date of death, pursuant to Section 10.2 of the Partnership Agreement, using the determination of fair market value of the Property assented to by their respective appraisers ($17,790,000) in making that calculation.
B. The Pay-Out Provisions of the Partnership Agreement
The Estate next contends that defendant Robert DePasquale is bound as a matter of law by the five-year quarterly pay-out provisions contained in the May 15, 1990 amendment to the Partnership Agreement (the "Amendment"). It argues that the five-year pay-out term contained in the Amendment was suggested by defendant Robert DePasquale as a time period with which he felt comfortable. The Estate therefore moves for summary judgment as to defendant Robert DePasquale's counterclaim for reformation of the Amendment.
Defendant Robert DePasquale counters that he did not understand the import of the Amendment as drafted (which makes no reference to a payment schedule, but merely references a five-year period for payment). He argues that counsel for the Estate led him to believe, at the time he signed the Amendment, that he was signing a document that provided him with a five-year period within which he would be required to obtain financing for the Property in order to buy out the Estate's interest in R W. In actuality, a promissory note attached as an exhibit to the underlying Partnership Agreement requires quarterly payments to begin immediately, with interest accruing, within five years, as established by the May 15, 1990 Amendment. Defendant Robert DePasquale contends that counsel for the Estate never explained to him the relationship between the two documents.
Under Rhode Island law, a party may acquire relief in the form of reformation of a contract where the party who signed the instrument was unaware of its character or where that party believed the instrument to have a different import. Hopkins v.Equitable Life Assurance Society of the United States,107 R.I. 679, 270 A.2d 915 (1970). Grounds for reformation also include mutual mistake and material misrepresentation. Associates inAnesthesia v. Mutual Benefit Life Insurance Co., 504 A.2d 477
(R.I. 1986). Reformation also may be had where a party misleads another party into the belief that the contract stands for a different proposition. Kornstein v. Almac's, Inc., 98 R.I. 318,201 A.2d 645 (1964).
Here, there are clearly disputed issues of material fact regarding Robert DePasquale's understanding when he signed the May 15, 1990 Amendment and the representations that were made to him by the Estate at that time. These disputed issues of material fact preclude this Court from granting summary judgment as to defendant Robert DePasquale's counterclaim for reformation.
Counsel shall prepare and submit to the Court forthwith a form of order and judgment consistent with this decision.