DECISION
Before the Court for decision is a request for preliminary injunctive relief evolving out of a significant business relationship apparently justifying the thousands of pages of court testimony, depositions and other discovery material together with the memoranda presented and/or furnished to the Court relative hereto.
The factual backdrop to the present controversy as found by this Court for the purpose of this decision is as follows:
 For some period of time prior to January 1, 1996, Handy Harman Electronic Materials Corporation (hereinafter "HHEMC"), a company involved in the metals electroplating business, had performed services for Cardell Corporation (hereinafter "Cardell"), a major supplier of high quality electrical connectors, to the automotive industry. Cardell's largest customer was Ford Motor Company. Cardell designed and stamped these electrical connectors and utilized third party — that is to say, non-Cardell owned — job shops (such as HHEMC) to plate the electrical connectors.
HHEMC was in competition with other job shops for this business. HHEMC charged and Cardell paid for the plating services at rates set through arms-length negotiations.
HHEMC and Cardell, acting through their agents and servants, started to discuss the concept of a joint undertaking (a joint venture) sometime in 1994. Cardell did not own or control a plating operation and faced competition from integrated suppliers. Integrated suppliers for the purposes hereof are companies that perform the functions performed by Cardell and which owned and/or controlled plating operations. In addition, Cardell had certain concerns with respect to aspects of HHEMC's continuing ability to properly provide precious metal electroplating services. HHEMC, of course, viewed a joint venture arrangement as a business opportunity. By the Spring of 1995 the negotiations had reached the point where counsel for the respective parties were working on and circulating drafts of documents which included, but were not limited to,
 (1) a Joint Venture Agreement (2) a Non-disclosure Agreement (3) a Non-competition Agreement (4) a Requirements' Agreement; and
As part of the finalization of the joint venture arrangement, HHEMC employed a subsidiary entity, Handy Harman Peru, Inc. and Cardell utilized a subsidiary entity, Delaware Gold Investment Company. These subsidiaries became parties involved in, and indeed were parties to, one or more of the foregoing agreements as will hereinafter be set forth in greater detail.
Generally, but without intending at this point to fully discuss the various pertinent agreements, the Court finds the following:
 (1) On January 1, 1996, the Joint Venture Agreement, creating the joint venture, Electro-Connection Finishers, was executed between Delaware Gold Investment Company and Handy Harman Peru, Inc. Pursuant to the provisions of that agreement, the joint venture was formed as a general partnership pursuant to the Delaware Partnership Act ". . . for the purpose of providing electroplating or plating services to Cardell, Inc." Delaware Gold's ownership interest in the joint venture was thirty percent and Handy Harman Peru's ownership interest was seventy percent. The implementation of the joint venture was conditioned, inter alia, on the execution by designated entities of,
 (a) the Requirements' Agreement dated as of January 1, 1996 by and between Cardell "as buyer" and the joint venture as "seller" relating to the processing of designated product of Cardell by the joint venture and the price to be charged therefor by the joint venture. This agreement provided for a four-year term, through and including, December 31, 2000 and for a year-to-year extension thereafter; however, it also provided that either party with or without cause had the right to terminate upon 180 days written notice to the other.
 (b) the Non-disclosure Agreement dated as of January 1, 1996 between Cardell and HHEMC relating to the disclosure of non-public information from one or the other of the parties thereto and their affiliates or representatives to the other party or its affiliates or representatives and subject to certain mandates requiring the receiving party to treat such information as confidential and to use it only in connection with the joint venture's business. This agreement is governed by the laws of New York and as to Non-trade Secret Information was to continue for a period of two years following the termination of the Requirements' Agreement (Trade Secret Information was indefinitely to continue to be subject to confidentiality so long as the trade secret remained a trade secret.) This agreement also provided that "Each party understands and agrees that money damages would not be a sufficient remedy — — — and that the other party shall be entitled to seek injunctive or other equitable relief to remedy or forestall any such breach or threatened breach." (Underscoring added.)
 (c) the Non-competition Agreement dated as of January 1, 1996 between Cardell and HHEMC provided that upon the happening of certain events therein specified, Cardell during a period measured from the termination of the Requirements' Agreement to the purchase by the joint venture of Delaware Gold's interest in the joint venture (as provided in Article XII of the Joint Venture Agreement) and for a further period of two years thereafter, ". . . will not, without the prior written consent of HHEMC, directly or indirectly, own, manage, control, operate, invest or acquire an interest in, or otherwise engage in, or act for or on behalf of any person engaged in, the business of providing precious metal electroplating plating services in North America." This agreement also provided that the parties ". . . acknowledge and agree that the remedy at law for any breach of any of their obligations under this agreement could be inadequate and agree and consent that temporary and permanent injunctive relief, in addition to any other remedy at law or equity, may be granted . . ." (Underscoring added.) This agreement by its terms also is governed by the law of New York.
 (d)(i) a Management Agreement between the joint venture and HHEMC (ii) a lease between the joint venture and HHEMC covering certain space located at HHEMC's East Providence, Rhode Island facility, and (iii) a precious metals consignment agreement between the joint venture and the parent of HHEMC, Handy Harman, a New York Corporation.
Following the execution of the documents, two (2) reel-to-reel plating lines were designed by HHEMC for the joint venture, the first of which was up and running by the final week of December 1996 and the second of which was operable about five months later. These lines were designed to plate Cardell female blanks and male micropins (both types of high quality electrical connectors for use in the automotive industry). The joint venture operated successfully and profitably (some measure of its financial success is shown by the fact that Cardell, not its subsidiary, Delaware Gold Investment Company, the putative joint venturer, received dividend checks in 1998 of more than one million one hundred seventy thousand dollars and in 1999 of about one million two hundred thousand dollars) and indeed, even as of the date of this decision, continues to operate. Written notice of termination of the Requirements' Agreement has long since been given pursuant to its provisions. Such notice pursuant to the various agreements herein referred to when effective, terminates the joint venture.
From the beginning of the joint venture to the effective date of the termination notice, June 1, 2000, even though there were some quality problems and, even though there was pressure from Cardell's primary customer, Ford Motor Company, upon Caldwell to reduce costs, causing Caldwell to put corresponding pressure on the joint venture, there was cooperation between the joint venturers with respect to dissemination of information, cooperation with respect to problem solving and cooperation in connection with work on developing a means of affecting a price reduction through a thinner gold flash plating initiative, as will be discussed at some length infra.
Towards the end of 1998, Cardell's chief executive officer mentioned to HHEMC personnel the possibility that Cardell might be acquired by Molex Corporation (hereinafter "Molex"). Molex had been involved for over twenty years in precious metal and so-called reel-to-reel electroplating, the same type of electroplating being performed by the joint venture for Cardell. Molex operates thirteen electroplating facilities worldwide, including three in the United States. Molex not only operates electroplating facilities but also manufacturers a variety of electrical connectors which are sold to customers in the automotive industry. Essentially, Molex is an integrated supplier as that term was defined at page 2 above.
Molex acquired Cardell in a triangular merger, so called, in mid-June of 1999. Prior to the acquisition, Molex performed due diligence investigations of Cardell assets and operations which inter alia included investigation of the joint venture (as will be discussed infra).
On December 1, 1999, Cardell faxed and mailed a notice of termination of the Requirements' Agreement between Cardell and the joint venture which purported to be effective one hundred eighty days from the date thereof pursuant to the provisions of paragraph 9(a) of said agreement.
Molex intends to perform the electroplating heretofore furnished by the joint venture to Cardell at Molex' Upland Facility located in Lincoln, Nebraska at which facility, two new reel-to-reel electroplating lines have been or are being built for such purpose.
Additional facts shall be provided in this decision insofar as appropriate with respect to the discussion of specific legal issues hereinafter addressed.
Essentially, at this time, plaintiff's seek preliminary injunctive relief so as to prohibit
 (1) defendants from competing with HHEMC by (a) Cardell and/or (b) Molex electroplating Cardell's products, which are subject to the provisions of the Requirements' Agreement; or otherwise engaging in the precious metal electroplating business in North America.
 (2) defendants from utilizing confidential information imparted by HHEMC during the course of the joint venture as provided in the Non-disclosure Agreement and further as to information obtained by Molex and covered by certain Mutual Confidential Non-disclosure Agreements executed by Molex and HHEMC in June 1999, further referred to infra; and
 (3) defendants from appropriating to themselves the joint venture's research project, the Lower Cost or Thinner Gold Flash Plating Initiative.
In seeking injunctive relief, preliminary in nature, plaintiffs' of course bear the burden of proving, as hereinafter indicated, every element required to support their prayers in order to justify the trial justice's exercise of his or her sound discretion. Houlihan v. Town of New Shoreham, 738 A.2d 536, 537-38 (RI 1999). The standard to be applied by a Rhode Island court is well settled and was recently articulated by our Supreme Court as follows:
 "We have long recognized that an application for temporary injunctive relief is `addressed to a trial justice's sound discretion' upon review, we will not disturb the exercise of a hearing justice's discretion on an application for preliminary injunction unless it is reasonably clear that the hearing justice illegally exercised his or her discretion, or has abused his or her discretion.
 As a first matter we consider the United Way's contention that the hearing justice in this case abused his discretion in considering the requisite factors in granting the preliminary injunction. Though variously articulated in our decisions, the criteria a hearing justice should consider in deciding whether to grant a preliminary injunction are well settled. The moving parties seeking a preliminary injunction must demonstrate that it stands to suffer some irreparable harm that is presently threatened or imminent and for which no adequate legal remedy exists to restore the plaintiff to its rightful position. The moving party must also show that it has a reasonable likelihood of succeeding on the merits of its claim at trial. We do not require a certainty of success. Instead we require only that the moving party make out a prima facie case. Having found a likelihood of success and an immediate irreparable injury, the trial justice should next consider the equities of the case by examining the hardship to the moving party if the injunction is denied, the hardship to the opposing party if the injunction is granted and the public interest in denying or granting the requested relief. In considering the equities, the hearing justice should bear in mind that
 `The office of a preliminary injunction is not ordinarily to achieve a final and formal determination of the rights of the parties or of the merits of the controversy, but is merely to hold matters approximately in status quo, and in the meantime to prevent the doing of any acts whereby the rights in question may be irreparably injured or endangered.'" (Interior citations omitted.)
Fund for Community Progress v. United Way, 695 A.2d 517, 521 (RI 1997)
Thus, before exercising his or her sound discretion, the Court must be satisfied by the plaintiffs as to the "requisite factors" discussed above. This Court seriatim will discuss and apply such factors as are necessary for this decision to the relief sought by plaintiffs with respect to,
 (a) the Non-competition Agreement;
 (b) the Non-disclosure Agreement; and,
 (c) the Low Cost Gold Flash Palladium Initiative.
 THE NON-COMPETITION AGREEMENT
Turning first to the Non-competition Agreement, plaintiffs urge upon this Court a reading thereof which would preclude Cardell from doing its own in-house precious metal electroplating and indeed would prevent Molex from performing precious metal electroplating services at any of its North America facilities. Plaintiffs allege that Molex is a successor to Cardell and thus is bound by the successor language found at paragraph three of the Non-competition Agreement. In the view which this Court takes of the Non-competition Agreement, plaintiffs' position insofar as the Non-competition Agreement is concerned, cannot prevail.
Have plaintiffs demonstrated a likelihood of success on the merits? For the reasons which follow, this Court answers that question "no."
The business of Cardell, as found by this Court, is the business of manufacturing and selling high quality electrical connectors, primarily to the automotive industry. An aspect of the manufacture of such parts is the electroplating of precious metals onto discrete portions of those connectors. What Cardell agreed to in the Non-competition Agreement was that it would not be involved (see the language quoted from paragraph one of said agreement in (c) on pages three and four above in "the business of providing precious metal electroplating services in North America." While there was some diverse testimony as to the intent of the parties, it seems clear to this Court that the language of the agreement itself does not preclude Cardell from establishing an in-house operation to serve its own needs — of course, the cited language would tend to preclude Cardell from functioning as a job shop and/or from offering such services to others.
There is no evidence before the Court that at the time that this agreement was negotiated and entered into that any relationship existed between Cardell and Molex. To preclude Molex from conducting its operations as a "captive shop" as opposed to a "job shop," absent specific language, would be to apply a tortured construction to the agreement. In any event, nothing in the Non-competition Agreement could be construed so as to preclude Cardell, having given notice of the termination of the Requirements Agreement, from utilizing any other job shop to perform necessary precious metal electroplating services for it.
Even assuming arguendo that plaintiff had established the likelihood of success on the merits, this Court would have to find some irreparable harm for which no adequate legal remedy existed to restore plaintiffs to their rightful position. The question then becomes, what protectable interest of the plaintiffs has been affected by the imminent action of defendants Cardell and/or Molex. Here, the only apparent loss to plaintiffs would be the loss of the Cardell business. The agreement provides for a term certain as to the prohibition. Based upon existing financial information and appropriate discovery devices, the loss to plaintiffs which would be occasioned easily is quantifiable. As to a putative breach of the Non-competition Agreement, this is a case for which there is available an adequate legal remedy, money damages. Further, because, as indicated above, the Requirements Agreement has been terminated in accordance with its terms, no valid purpose is served by granting equitable relief at this time, insofar as the Non-competition Agreement is concerned. Equitable enforcement of that agreement and its non-competitive covenant under the attendant circumstances serves to further no legitimate or substantial business interest of plaintiffs and is not favored as a grounds for equitable relief in this jurisdiction.
 THE NON-DISCLOSURE AGREEMENT
In order properly to determine if plaintiff's have demonstrated a likelihood success on the merits so as to satisfy one element in their quest for preliminary injunctive relief so far as it pertains to the alleged misappropriation or use of trade secrets or confidential information, this Court starts by examining the pertinent language of the January 1, 1996 Non-disclosure Agreement.
Paragraph 2 of that agreement defines confidential information thusly:
 "The parties acknowledge that, in the course of the conduct of the Business by the Venture each of Cardell, HHEMC and their respective affiliates and Representatives may receive certain non-public and confidential information from or about the other party or its affiliates, including but not limited to know-how including trade secrets, proprietary know-how and use and application know-how, technical, financial and business plans and models, names of customers or partners, proposed business deals, reports, market projections, software programs, data or any other confidential and proprietary Information relating to the Business. All the foregoing Information thus supplied by either party to the other or the other's affiliates or Representatives is hereinafter called the `information.' Any information supplied by either party to the other prior to the execution of this Agreement shall be treated as the Information made available after the execution of this Agreement."
This paragraph is followed by paragraph 3 seemingly here not significant which excludes certain types of information from the definition of Confidential Information.
In paragraph 4 is found the operative language with respect to Confidential Information. That language is:
 "The Information shall be used by the receiving party solely in connection with the Business, and shall not be otherwise used for the receiving parties' own benefit, or for any purpose detrimental to the disclosing party."
It should be noted that the word "Business" for the purpose of this agreement is defined in the recital's section of this Agreement to which Cardell and HHEMC are parties as ". . . a joint venture . . . in partnership form, for the purpose of providing electroplating or plating services to Cardell" — Another possible reading of this recital would define Business as ". . . providing electroplating or plating services to Cardell" for the purposes of this decision, there is no significant difference between these two definitions.
It is worthy of note that this agreement also contemplated that not only would the signatories be receiving confidential information, but so, too would their respective affiliates. This agreement would have equal vitality as to the affiliate's misuse of such information as might come into their possession pursuant to its terms. Any other reading of this document not only would emasculate the entire document, but would be entirely inconsistent with its clear intent.
With the terms of this agreement as explained above in mind, what have the plaintiffs here established by way of a prima facie case so as to satisfy their burden with respect to demonstrating a likelihood of success on the merits?
The evidence shows and the Court finds that upon the acquisition by Molex of Cardell, Molex for the purposes of the Non-disclosure Agreement was an affiliate of Cardell and the agreement as set forth above contemplated that representatives of each party to that agreement and its affiliates may be receiving confidential information as therein defined. Accordingly, the mere receipt of such information by Molex was not actionable.
Plaintiffs here, of course, predicate this action not on the fact that Molex received certain information (although they do assert that some of the information was obtained not as contemplated by the agreement) through what only can be termed industrial espionage)[1]. For example, the evidence tends to demonstrate that after a decision had been made to terminate the Requirements' Agreement and to have Molex perform the plating operations formerly performed by the joint venture, but before this fact had been made known to the plaintiffs, Molex gained entry to the joint venture's East Providence operation for what ostensibly was a due diligence inspection in connection with their contemplated acquisition of Cardell. This visit occurred in early June 1999 and was preceded by internal e-mail memos among certain Molex employees in May which noted: "We will be at a severe disadvantage if I am not able to view the plating processes at ECF (the joint venture). Viewing their processes will benefit our line design immensely and also aid in estimating line speeds."
It is clear that in anticipation of the acquisition of Cardell, defendants had established certain working committees or teams which inter alia included a so-called plating integration team, as well as line design teams whose purposes were in the first instance to determine the synergy to be obtained from performing within the Molex family of companies the precious metal electroplating and plating operations with respect to Cardell's products and, as to the design teams, to design the plating lines to perform those services.
There can be no question but that the evidence before the Court leads to the factual conclusion that Molex obtained from the due diligence inspection referred to above and from access to information obtained when its plating employees, as representatives of Delaware Gold, participated in an operation's review, problem-solving session, at the joint venture in Rhode Island in August of 1999 certain technical know-how utilized by HHEMC and the joint venture in the electroplating process.[2]
Most significant is a series of October 1999 memos spanning a one-week period. On October 12, the palladium terminal line design team set forth its proposed line layout in some specific detail. One of the recipients of this memo, which contained minutes of a meeting of this team on the previous day, was Jim Nuttleman. Mr. Nuttleman, on the 15th of October, memoed the design teams a copy of his trip report to the joint venture for the operation's review, problem-solving session in August. The record reflects that the palladium terminal team met on the 18th of October as reflected in a memo dated October 29 which contained the minutes of the meeting of the 18th. These minutes and memo show that (i) the palladium terminal team went from a layout containing seven nickel cells to a layout with six twenty-eight inch nickel cells which equal the present cells at Handy Harman. The trip report (the memo of October 15) states that the joint venture's layout consists of three seventy-two inch nickel cells. Examination of these same memos also demonstrates other potentially disquieting similarities in features in the lines as designed and perhaps as built by Molex in Lincoln, Nebraska with the joint venture's lines in East Providence, Rhode Island. Defendants, during the course of the hearing before the Court, elicited testimony from their proffered expert to the effect that he had examined the Lincoln, Nebraska lines and had conferred with Molex employees there and that the lines, as built in the case of one, and as nearly completed in the case of the other, were consistent with other lines long since established at Molex' Lincoln facility — that the process and equipment, including the layout, was consistent with off-the-shelf commercially available and well-known technology and that the line layout and methodologies were not proprietary, but rather were well known and generally utilized in the precious metal electroplating industry.
The evidence tends further to demonstrate discreet dissimilarities between the joint ventures and Molex's electroplating lines.
What is clear to this Court, mixing the similarities and the dissimilarities and having heard from defendants' expert (who, of course, did not examine plaintiffs' lines), is that plaintiffs have failed to demonstrate that the Molex lines have had incorporated into them non-public and confidential information "___, including but not limited to know-how including trade secrets, proprietary know-how and use and application know-how, technical, financial and business plans and models — — — or any other confidential and proprietary information relating to the Business." It may well be that at an ultimate hearing on the merits based on further discovery and/or based upon expert testimony following inspection and examination of Molex' lines in Lincoln, Nebraska, and comparison with the lines existent in East Providence, this presently glaring hole in plaintiffs' case will be established to the satisfaction of the trier of fact, but for now, this Court holds that the lack of this type of evidence constitutes a failure by plaintiffs to sustain their burden of making out a prima facie case so as to establish the requisite showing of likelihood of success.
Unlike the situation with respect with the Non-competition Agreement, here, had the plaintiffs carried their burden, this Court, in view of the agreement of the parties that money damages would not be a sufficient remedy would have had no problem in determining that plaintiffs stand to suffer irreparable harm, presently threatened or imminent, and for which no adequate legal remedy exists.
Reliance by plaintiffs on cases such as Pepsi Co., Inc. v. Redmond,54 F.3d 1262 (7th Circuit 1995) dealing with the doctrine of inevitability are misplaced absent some evidence that confidential information, as defined in the agreement, is present in Molex' lines. Here, this Court has found that plaintiffs have failed thus far to offer sufficient evidence on this issue to make out their prima facie case. Here, there are tangible items that either are or are not contained in the Molex lines which result from the industrial espionage which this Court has found was engaged in by defendants. There is no reason to infer that it was or was not used — the Court need not invoke concepts of inevitability, if such information as was wrongfully gained is being or is about to be availed of in order to plate Cardell's products, credible expert testimony would ferret this fact out. As indicated above, the lack of such evidence has prevented plaintiffs from sustaining their burden.
Further, reliance on cases such as Minnesota Mining and Manufacturing Company v. Technical Tape Corp., 192 N.Y.S.2d 102 (Supreme Court New York 1959) does not assist plaintiffs because of their failure to establish, prima facie, that Molex is using or is about to use in its two new Lincoln Nebraska Electroplating lines, or otherwise, secret or confidential processes or methods or combinations of equipment in a design pilfered by Molex or otherwise wrongfully taken from plaintiffs.
 LOW COST GOLD FLASH PALLADIUM INITIATIVE
Turning now to what has been referred to as the Low Cost Gold Flash Palladium Initiative. The Cardell parts presently plated by plaintiff joint venture pursuant to the Requirements' Agreement call for a specification with a nickel base of 80-100 microinches over which is plated 40 microinches of pure palladium and a layer of hardened gold of 2-5 microinches. As indicated above, Cardell constantly was subjected to pricing pressure from its customer, Ford Motor Company. It in turn sought pricing relief from the joint venture. Early on, it was recognized by the parties that cost saving might be achieved through a reduction in the utilization of precious metals — a change in the specifications to use less palladium and/or gold — would of course permit a reduction in the cost of the materials used in the plating operation and likely would permit a reduction in the per unit price from the joint venture to Cardell and from Cardell to its customer. In connection with any such change in specification, there was ". . . need for an understanding of the relationship of gold/palladium plating, thickness verses cost, and the wear resistance of gold/palladium plating as a function of thickness."
Prior to the inception of the joint venture, both HHEMC and Cardell were familiar with the concept of pure palladium electroplating. As early as 1992 HHEMC had written to Cardell and to Ford with respect to the use of palladium rather than gold plating. Even before the formation of the joint venture, Cardell was discussing the concept of plating thinner applications of palladium on the terminals sold to Ford.
There is no question but that substantial research was contemplated during the joint venture and that its board approved a research and development project to investigate Low Cost Gold Flash Palladium plating. There is no question but that the project had proceeded to the point where all that remains before commercial application with the ultimate customer, Ford, was the preparation of a PPAP (a form demonstrating and evidencing that the process to be used will produce quality products consistently). The evidence before the Court demonstrated that at a relatively modest cost and in a relatively short period of time (one week) a PPAP could be completed. Plaintiffs claim that defendants had precluded this from occurring because they intend, after the joint venture is terminated, to appropriate this claimed asset of the joint venture to themselves and that such activity constitutes a breach of their fiduciary duty as joint venturers. Plaintiffs point to the fact that plaintiffs have paid significant costs incident to the development of this process including charges evidenced by an invoice from Molex Cardell Automotive dated December 10, 1999 covering approximately $46,000.00, the last mentioned date being subsequent to the filing of the instant lawsuit. Plaintiffs also have demonstrated that at the time of the acquisition of Cardell by Molex, the research and development project involving the Low Cost Gold Flashing Palladium plating was three years old and that the joint venture had produced over one million of each of the parts subject to the provisions of the Requirements' Agreement utilizing that process, that Ford had approved the process capability study and that those million plus parts were produced as test parts.
Defendants, to the contrary, assert that the concept underlying what plaintiffs deem to be an asset of the joint venture long predates that joint venture and is not a proprietary process at all. They point to evidence that other electroplating job shops were engaged in pure palladium electroplating of electrical connectors and provide a list of such job shops that were so engaged by 1994, two years before the inception of the joint venture. Included on that list is Handy 
Harman. Further, defendants urge upon the Court that what is at issue is not a process at all, but rather, is a potential new specification which Ford Motor Company could make available to any supplier.
Finally, defendants assert that plaintiffs' contribution to the so-called initiative was meager; that HHEMC did not possess the appropriate know-how; that Cardell's engineers and R D staff had to educate and train HHEMC's staff in order for plaintiffs to conduct so-called coupon testing with respect to conduct resistance; and finally, all that HHEMC did was preliminary first-round testing.
What then are the legal ramifications of the facts as found by the Court insofar as plaintiffs assert that defendants have breached a fiduciary duty owed by reason of the Joint Venture Agreement.
Section 14.2 of that agreement clearly requires that the agreement and the obligations of the parties are to be construed in accordance with the laws of the State of Delaware. Recently, the United States District Court for the District of Delaware in Resource Ventures, Inc. V. Resources Management International, Inc., et al. 42 F. Supp.2d 423, 440 (1999) applying Delaware law had occasion to write:
 "If the plaintiff and the defendants are joint venturers, then each would `owe the other a fiduciary duty of utmost good faith, fairness and honesty with respect to their relationship to each other and to the enterprise.'"
That court went on to explain that a joint venture is a ". . . partnership limited in its scope and duration." The court also noted that "while joint venturers owe each other and the enterprise a fiduciary duty, such a duty ends with the death of the joint venture." Here, of course, while the joint venture presently continues, it is only because of the pendency of this proceeding. Here, essentially, notice of the termination of the Requirements' Agreement was to have been effective on June 1, 2000. Termination of that agreement triggers the termination of the joint venture. Pending this decision an hiatus as to the termination has been agreed to by the parties. Effectively, the order to be entered herein with respect to the Non-competition Agreement ultimately will cause the termination of the joint venture. Does this fact lessen the fiduciary obligation of the parties to the Joint Venture Agreement? The answer to that question clearly is "no." Is Molex, at this juncture, deemed to be a party to that agreement? This Court holds that the evidence tends to establish that Cardell, while maintaining its separate legal existence, has been folded into Molex and that, in fact, the Cardell division of Molex really has been functioning as the party to the joint venture, just as the evidence tends to show that it was Cardell, rather than Delaware Gold Corporation, that functioned as the 30 percent joint venturer in Electro-Connection Finishers, the Joint Venture.
It is against the foregoing backdrop that plaintiffs ask this Court preliminarily to enjoin defendants from "electroplating pure palladium and gold flash palladium finishes employing pure palladium," and "from disclosing, using or disseminating Handy Harman's and ECF's confidential information ___ including ___ (a) all information respecting the Lower Cost Gold Flash Palladium Project ___" (plaintiffs' post hearing memorandum at page 64).
Applying to this "demand for relief" the Fund for Community Progress analysis set forth above at pages six and seven and following the same analytical approach as applied heretofore with respect to the Non-competition Agreement and to the Non-disclosure Agreement, the first inquiry by the Court is with respect to whether plaintiffs have established the likelihood of success on the merits, have they made out a prima facie case? It is clear to the Court that the concept of being able successfully to electroplate "Cardell's" micropins and flat stock to a different specification from that which presently pertains while maintaining appropriate wear resistance is within one week's work (and the expenditure of approximately $80,000.00) of probable commercialization of the process and that this progress was achieved through the joint efforts of Cardell and of HHEMC. This, of course, was the object of the earlier approval by the joint venture board with respect to the research and development project. This Court finds that plaintiffs have made out a prima facie case demonstrating that defendants are in breach of their obligation as joint venturers and of the good faith and fiduciary responsibilities they had to plaintiffs because they have stymied fruition of this project so that upon the inevitable termination of the Requirements' Agreement and of the joint venture they, defendants, can appropriate to themselves all of the work and all of the benefit (if any) to be derived from the commercialization of the revised — cheaper — specification. It is the Joint Ventures know-how that will permit the Joint Venture or Molex-Cardell to perform plating services to the new specification. For example, Ford Motor Company approved certain studies with respect to the effectiveness of the metallurgy involved in plating to the new specification predicated on the use of Handy Harman's plating process.
Having established the likelihood of success on the merits by determining that plaintiffs have made out a prima facie case, the inquiry now turns to the issue of irreparable harm threatened or imminent for which there is no adequate legal remedy.
Defendants argue that there is no protectable property interest and citing Dial Media v. Schiff, 612 F. Supp. 1483, 1489-90 (D.R.I. 1985) claim that under such circumstances there cannot be irreparable harm. This Court believes that this argument of defendants' misses the point because of the findings above with respect to the likelihood of success on the merits. To say that money damages could be determined or to argue as defendants do, that the proper remedy for breach of fiduciary duty is an accounting and restitution, but not the imposition of injunctive relief, goes beyond what the law permits.
There, of course, can be no question but that a court of equity in a proper case and in the exercise of the trial justice's (chancellor's) sound discretion should be able to fashion a proper remedy. Here — the specification and the final approval of the process to meet that specification has not yet been issued — there presently is no commercialization of the process to achieve the cost-saving specification, so when defendants' interest in the Joint Venture is valued pursuant to Article XII, 12.1(a) and (b) of the Joint Venture Agreement, that process will be valued and if appropriate under the valuation method to be used in determining the value of defendants interest, defendant Caldwell will receive its appropriate share thereof as part of the purchase price contemplated by such sections. To permit defendants unilaterally to take this process as their own and to suggest that this Court does not have the power at this preliminary stage to enjoin such action flies in the face of the maintenance of the status quo, the proper office of a preliminary injunction. There is no demonstrated hardship imposed on defendants here.
 CONCLUSION
In conclusion, predicated upon all of the foregoing, this Court will enter an order:
 (1) Denying plaintiffs' request for preliminary injunctive relief so far as it pertains to the Non-competition Agreement,
 (2) Denying plaintiffs' request for preliminary injunctive relief so far as it pertains to the Non-disclosure Agreement, and
 (3) Granting plaintiffs' request for preliminary injunctive relief with respect to the utilization by defendants, or any of them, of the know-how developed pursuant to the low cost Gold Flash Palladium initiative as herein described.
Counsel for the plaintiffs shall on or before the close of business on the 26th of October, 2000 file with the Court an order consistent with the provisions hereof. The Court will hear argument with respect thereto at 2:00 p.m. on Monday, October 30, 2000 in Courtroom 17, Licht Judicial Complex, Providence, Rhode Island.
[1] Generally as to "industrial espionage" see E. I. duPont deNemours Company, Inc. V. Christopher, 431 F.2d 1012 (8th Circuit, 1970) and Comment Industrial Espionage, Piracy of Secret Scientific and Technical Information, 14 UCLA Law Review 911 (1967).
[2] The Court notes that in evidence are copies of mutual confidential Non-disclosure Agreements between HHEMC and Molex executed at the time of the "due diligence inspection" of the Joint Venture Facility. Those agreements (Exhibits S and T) in paragraph 5 provide that the damages resulting from a breach thereof "may do substantial harm to the disclosing party and these damages may be difficult to determine, therefore, the breaching party will be liable for reasonable legal expenses and punitive damages in addition to any awarded damages" however, these agreements are silent as to the availability of equitable relief.